257 F.3d 937 (9th Cir. 2001)
 VENETIAN CASINO RESORT, L.L.C., A DELAWARE LIMITED LIABILITY COMPANY, PLAINTIFF-APPELLANT,
v.
LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS; CULINARY WORKERS UNION, LOCAL NO. 226, AN UNINCORPORATED ASSOCIATION; BARTENDERS UNION, LOCAL NO. 165, AN UNINCORPORATED ASSOCIATION;
CLARK COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA; STEWART L. BELL, IN HIS CAPACITY AS DISTRICT ATTORNEY OF CLARK COUNTY, NEVADA; LAS VEGAS METROPOLITAN POLICE DEPARTMENT, DEFENDANTS-APPELLEES,
AMERICAN CIVIL LIBERTIES UNION, INTERVENOR-APPELLEE.
 No. 00-15136
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 18, 2000
July 12, 2001
 
 Walter E. Dellinger, O'Melveny & Myers L.L.P., Washington, D.C., for the appellant.
 Michael T. Anderson, Davis, Cowell & Bowe, L.L.P., San Francisco, California, and Mitchell M. Cohen, Deputy District Attorney, Las Vegas, Nevada, for the appellees.
 Allen Lichtenstein, Las Vegas, Nevada, for the intervenor-appellee.
 Appeal from the United States District Court for the District of Nevada Philip M. Pro, District Judge, Presiding. D.C. No. CV-99-00276-PMP
 Before: Mary M. Schroeder, Chief Judge, Procter Hug, Jr. and Melvin Brunetti, Circuit Judges.
 OPINION by Judge HUG; Dissent by Judge Brunetti.
 Hug, Circuit Judge.
 
 
 1
 The question we are presented with in this appeal is whether a sidewalk constructed on private property to replace a public sidewalk, accommodating pedestrian traffic adjacent to Las Vegas Boulevard, is a public forum subject to the protections of the First Amendment. The Venetian Resort Casino sued Clark County, the Clark County District Attorney, and the Las Vegas Metropolitan Police Department (collectively, "the County"), seeking a declaratory judgment that the replacement sidewalk constructed on its property is not a public forum and an injunction requiring the County to recognize and enforce the Venetian's right to exclude labor union demonstrators from the sidewalk. The district court denied the Venetian's request for an injunction and granted summary judgment in favor of the County and intervenors, the Local Joint Executive Board of Las Vegas, Culinary Workers Union, Local No. 226, and Bartenders Union, Local No. 165 (collectively, "the Unions"), and the ACLU of Nevada. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 
 2
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 
 
 3
 The Venetian Casino Resort is a large hotel and casino complex located on the former site of the Sands Casino on Las Vegas Boulevard South--"the Las Vegas Strip"--in Clark County, Nevada. As part of the approval process for demolishing the Sands and building the Venetian, the developers of the Venetian commissioned a study to determine the impact the new casino would have on traffic along Las Vegas Boulevard. The traffic impact study recommended widening Las Vegas Boulevard by one traffic lane along the Venetian frontage. In order to widen the roadway, however, the existing public sidewalk along the Venetian frontage would have to be removed to make room. The new lane of traffic would completely fill the State of Nevada's right-of-way on Las Vegas Boulevard, leaving no remaining public right-of-way on which to construct a new public sidewalk. The sidewalk, therefore, would have to be relocated onto the Venetian's property.
 
 
 4
 The overall building permit required the approval of Clark County. Initial discussions concerning the widening of Las Vegas Boulevard and the replacement of the sidewalk were conducted with Clark County officials. However, because Las Vegas Boulevard is on a State right-of-way, the Venetian entered into negotiations with the State of Nevada Department of Transportation ("Department") to resolve the issue of continued pedestrian passage along Las Vegas Boulevard after the widening of the street. On January 8, 1999, shortly before the Venetian opened for business, the Venetian and Department entered into an agreement ("1999 Agreement"). It is this agreement that is at issue in this case.[1] The 1999 Agreement provides:
 
 
 5
 The [Venetian] shall construct and maintain on its property along Las Vegas Boulevard South a private sidewalk connecting to public sidewalks on either side of its property. The private sidewalk shall have a minimum width of ten feet and shall satisfy the Americans with Disabilities Act for the purpose of providing unobstructed pedestrian access.
 
 
 6
 The Venetian further agreed to "remove or modify any of the [Venetian's] improvements at the [Venetian's] expense if they become a hazard or obstruction to either pedestrian or vehicular traffic, as reasonably determined by the DEPARTMENT," and to
 
 
 7
 dedicate necessary right-of-way to the DEPARTMENT and to construct thereon a sidewalk, with a minimum width of ten feet, behind the curb and gutter and adjacent to Las Vegas Boulevard at the [Venetian's] expense should the private sidewalk be removed, altered, or abandoned, and to construct the sidewalk at least equal to the State's standards. . . .
 
 
 8
 The 1999 Agreement specifies that is to be recorded and that it is binding on the Venetian's "heirs . . . successors and assigns."
 
 
 9
 In February 1999, the Venetian demolished the existing public sidewalk along Las Vegas Boulevard and constructed a temporary pedestrian walkway on its property.[2] Soon thereafter, the Unions applied for a permit to hold a demonstration in front of the Venetian.[3] The County issued a permit to the Unions on February 26, 1999. The permit authorized the Unions to hold a demonstration in front of the Venetian on the sidewalk and the inside traffic lane of Las Vegas Boulevard. When the Venetian learned of the planned demonstration, it hired a property surveyor to mark its property lines and erected signs stating that the pedestrian walkway was private property.
 
 
 10
 The Unions' demonstration took place on March 1, 1999. Approximately 1,300 people participated. During the demonstration, representatives of the Venetian issued warnings to the demonstrators that they were on private property. The Venetian also requested that the Las Vegas Metropolitan Police Department ("Police Department") remove the demonstrators from its property as trespassers. The Police Department, upon the advice of the Clark County District Attorney's Office, declined to issue citations or make any arrests. Following the demonstration, the Unions expressed plans to organize further demonstrations, and the County indicated that it would continue to authorize the demonstrations.
 
 
 11
 Three days after the demonstration, the Venetian filed the present action. The Venetian's complaint alleges that by granting a permit to the Unions to conduct a demonstration on the Venetian's private sidewalk, and by refusing to assist the Venetian in removing the demonstrators, the County has taken the Venetian's property without due process in order to create a public forum. The Venetian requests a declaratory judgment that the sidewalk is not a public forum and an injunction requiring the County to recognize and enforce the Venetian's right to exclude labor union demonstrators from the sidewalk. The Unions and the ACLU of Nevada were granted leave to intervene by the district court.
 
 
 12
 On April 27, 1999, the district court denied the Venetian's request for a preliminary injunction. See Venetian Casino Resort v. Local Joint Executive Bd., 45 F. Supp. 2d 1027 (D. Nev. 1999). The Venetian appealed this order, but subsequently withdrew the appeal and moved for summary judgment in the district court. On August 20, 1999, the court granted summary judgment against the Venetian and in favor of the County and the intervenors. This appeal followed.
 
 II. STANDARD OF REVIEW
 
 13
 We review a grant of summary judgment de novo . See Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc); Robi v. Reed, 173 F.3d 736, 739 (9th Cir. 1999). Our review is governed by the same standard used by the district court under Federal Rule of Civil Procedure 56(c). See Adcock v. Chrysler Corp., 166 F.3d 1290, 1292 (9th Cir.), cert. denied, 120 S. Ct. 55 (1999). "[We ] must determine, viewing the evidence in the light most favorable to the non-moving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." Balint, 180 F.3d at 1050. We may affirm a grant of summary judgment on any basis the record supports, including one the district court did not reach. See Herring v. Federal Deposit Ins. Corp., 82 F.3d 282, 284 (9th Cir. 1996); USA Petroleum Co. v. Atlantic Richfield Co., 13 F.3d 1276, 1279 (9th Cir. 1994).
 
 III. DISCUSSION
 
 14
 The Venetian argues on appeal, as it did before the district court, that because the sidewalk along Las Vegas Boulevard in front of the Venetian is located on the Venetian's private property, it is the casino's right as a private property owner to regulate speech and expressive conduct on its property. The Unions and the ACLU of Nevada respond by arguing that the sidewalk is a traditional public forum, despite its private ownership, and that the Venetian dedicated the sidewalk to public use in exchange for approval from the County and State to construct the hotel and casino complex.[4] We affirm the judgment entered by the district court.
 
 
 15
 It is important to recognize the circumstances giving rise to the construction of the replacement sidewalk on the property of the Venetian. It was the Venetian that desired that Las Vegas Boulevard be widened to accommodate automobile traffic in front of its hotel casino. The construction of an additional lane required utilizing the property where the State maintained a public sidewalk, which was an integral part of the public sidewalk accommodating pedestrian traffic going from one hotel casino to another along the Las Vegas Strip. In order to maintain a continuous sidewalk for pedestrians to walk along that side of Las Vegas Boulevard, without walking in the street, it was obvious that the sidewalk had to continue on the Venetian's property. The introductory clauses to the agreement between the Venetian and the Department set forth the reasons for the agreement:
 
 
 16
 Whereas, the [Venetian] is constructing a new casino resort and desires to utilize a portion of, and to access, the existing right-of-way along Las Vegas Boulevard adjacent to the [Venetian's] property in order to build an additional travel lane, modify median islands and build an approach to Las Vegas Boulevard.
 
 
 17
 Whereas, DEPARTMENT is responsible for control of traffic and maintenance of Las Vegas Boulevard, a state highway, and a sidewalk currently exists on DEPARTMENT right-of-way adjacent to the highway.
 
 
 18
 Now, therefore, the parties to this agreement hereby agree as follows:
 
 
 19
 Thus, it is apparent that the function of the replacement sidewalk on the Venetian's property was to be the same as the former public sidewalk in front of the Venetian and the sidewalks connecting on either side of the Venetian property. It is in this context that we interpret the first paragraph of the agreement, which states:
 
 
 20
 1. The [Venetian] shall construct and maintain on its property along Las Vegas Boulevard South a private sidewalk connecting to public sidewalks on either side of its property. The private sidewalk shall have a minimum width of ten feet and shall satisfy the Americans with Disabilities Act for the purpose of providing unobstructed pedestrian access.
 
 
 21
 It is clear that the Venetian is to provide unobstructed pedestrian access on this replacement sidewalk on the Venetian property. This was confirmed in the colloquy with the district court:
 
 
 22
 The Court: So it's Venetian's position that the --under the `99 Agreement, the passageway or walkway has to be open for people to traverse from north to south. . . .
 
 
 23
 Venetian: Yes, that is correct.
 
 
 24
 The Court: It--the Venetian, even though it's their property, cannot prohibit people from crossing it back and forth
 
 
 25
 Venetian: Right.
 
 
 26
 * * *
 
 
 27
 Venetian: "[W]hatever is incidental to pedestrian traffic, they are to facilitate.
 
 
 28
 They are not to block it. They are not to impose unreasonable prohibitions."
 
 
 29
 On appeal, there was some contention that the "unobstructed pedestrian access" only referred to compliance with the Americans with Disabilities Act. This corresponds neither with the statements to the district court nor with other references in the agreement.[5]
 
 
 30
 The parties mutually agreed in Paragraph 4 that"all covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors, and assigns as the case may be of the respective parties." It was further mutually agreed in Paragraph 5 "that this agreement shall be recorded."
 
 
 31
 Thus, there is a recorded servitude on this parcel of private property upon which the replacement sidewalk is located that the Venetian and its successors and assigns dedicate to public use to provide unobstructed pedestrian access on that sidewalk. The recorded agreement also provides in Paragraph 7 that should the sidewalk be removed, altered, or abandoned, the Venetian would dedicate the necessary right-of-way and construct a sidewalk at least equal to the State standards at the time of the restoration.
 
 
 32
 The issue before us is whether the sidewalk on private property that requires unobstructed pedestrian traffic is a public forum. It is uncontested that the public sidewalk previously existing in front of the Venetian was a public forum, and it is clear that if the sidewalk on Venetian's property is removed, altered, or abandoned that the new sidewalk dedicated to the State will be a public forum. The Venetian would have us believe that the parties did not intend the replacement sidewalk on the Venetian property to be a public forum. This replacement sidewalk is a thoroughfare sidewalk, seamlessly connected to public sidewalks on either end and intended for general public use. For "[t]ime out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum" Frisby v. Schultz, 487 U.S. 474, 480 (1988) (quotation omitted). They are the "archetype" of a traditional public forum. Id.
 
 
 33
 In this case, the title to the property was held by the Venetian, but by the agreement there was a servitude imposed for unobstructed public use of the sidewalk. Thus, for purposes of public use it was a public sidewalk with the normal attributes of a public sidewalk. In response to the district court's inquiry about the sidewalk, the counsel for the Venetian responded:
 
 
 34
 Whatever is incidental to pedestrian traffic, they are to facilitate. They are not to block it. They are not to impose unreasonable prohibitions.
 
 
 35
 Free speech is certainly incidental to pedestrian traffic, for, as the Supreme Court noted, streets and sidewalks are the archetype of a public forum. Frisby, 487 U.S. at 480.
 
 
 36
 In Freedom From Religion Foundation, Inc. v. City of Marshfield, 203 F.3d 487 (7th Cir. 2000), the Seventh Circuit was called upon to determine whether a privately-owned section of an otherwise public park, containing a large statue of Jesus, was a public forum for Establishment Clause purposes. The Seventh Circuit concluded that the sale of the .15-acre section of city park to a private organization did not affect the property's status as a public forum. Factors the court deemed important were the historically public use of the park, including the now privately-owned section, the location of the private section of the park in relation to the rest of the park, and the dedication of the private section to public use. See 203 F.3d at 494-95.
 
 
 37
 Other courts faced with the question of whether private property qualifies as a public forum have looked to similar factors. See, e.g., Thomason v. Jernigan, 770 F. Supp. 1195, 1201-02 (E.D. Mich. 1991) (finding privately owned cul-de-sac fronting abortion clinic to be a public forum, despite fact that city council had voted to vacate the public right-of-way the city held over the private property, because the area had traditionally been held open to the public for expressive activity and nothing distinguished the property from the other public sidewalks in the city); Jackson v. City of Markham, 773 F. Supp. 105, 109 (N.D. Ill. 1991) (finding sidewalk and shoulder of highway, although private, to be public fora because they were located within the public highway right-of-way and were traditionally used for public speech and assembly); Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, 745 F. Supp. 65, 76 (D. Mass 1990) (finding Faneuil Hall Marketplace, although leased and operated by a private organization, to be a public forum, in part because the marketplace was an area traditionally used for public assembly, was dedicated to public use, and was indistinguishable from the surrounding public streets and sidewalks).
 
 
 38
 Although in this case the particular parcel of land used for the replacement sidewalk had not been a public forum historically, the sidewalk in front of the Venetian and adjacent to Las Vegas Boulevard had been historically a public forum. It is the historical use of the sidewalk adjacent to Las Vegas Boulevard that is significant, not the piece of land on which the replacement sidewalk had to be located.
 
 
 39
 As the Seventh Circuit recognized in Freedom from Religion Foundation, "[w]hether a property has historically been used for public expression plays an important role in determining if the property will be considered a public forum." 203 F.3d at 494; see also International Soc. for Krishna Consciousness v. Lee, 505 U.S. 672, 680 (1992) (refusing to consider bus terminals and train terminals as traditional public fora because of their history of private ownership); Jacobsen v. Bonine, 123 F.3d 1272, 1274 (9th Cir. 1997) (concluding that interstate rest areas are not public fora because rest areas are "modern creations" and are "hardly the kind of public property that has by long tradition .. . been devoted to assembly and debate") (internal quotations and citations omitted). Here, it is uncontested that the sidewalk along the Venetian's frontage onto Las Vegas Boulevard historically has been a public forum. The sidewalk in front of the Venetian's predecessor, the Sands, was publically-owned, and we have previously held that "the public streets and sidewalks located within the Las Vegas Resort District" are public fora. S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1144 (9th Cir. 1998). Only with the construction of the Venetian, and the concurrent widening of Las Vegas Boulevard to accommodate to Venetian's private commercial interests, was the sidewalk rerouted onto private property.
 
 
 40
 The Venetian could argue that we should disregard the sidewalk's history as a public forum if the relocation of the sidewalk onto the Venetian's property had fundamentally altered the sidewalk's character or its use by the public, cf. Lee, 505 U.S. at 700 (Kennedy, J., concurring) (explaining that to change a property's public forum status, the state "must alter the objective physical character or uses of the property"), but that has not happened here. The newly constructed sidewalk still performs the same role as a thorough-fare for pedestrian traffic along Las Vegas Boulevard that it performed before the construction of the Venetian. As the district court found, the sidewalk is used "to facilitate pedestrian traffic in daily commercial life along the Las Vegas Strip generally," and not merely to provide access to the Venetian for its patrons. 45 F. Supp. 2d at 1035. Indeed, the sidewalk is the only means for pedestrians to travel north or south along the Venetian's side of Las Vegas Boulevard, a busy multi-lane traffic artery. Cf. United States v. Kokinda, 497 U.S. 720, 727-28 (1990) (plurality opinion) (distinguishing between walkway leading from parking area to front door of post office and "thoroughfare" sidewalk running parallel to street and holding that the later, but not the former, is a traditional public forum); Chicago ACORN v. Metropolitan Pier Exhibition Authority, 150 F.3d 695, 702 (7th Cir. 1998) (holding that Chicago's Navy Pier was not a traditional public forum because "[t]he sidewalks [on the pier] are not through-routes; they only lead to the pier facilities themselves . .. . The pier itself is a discrete, outlying segment . . . rather than a right-of-way"); see also Citizens to End Animal Suffering, 745 F. Supp. at 70 (finding significant the fact that "[m]any pedestrians wholly uninterested in the Marketplace's offerings cross its lanes daily in traveling to the waterfront.").[6]
 
 
 41
 There is also little to distinguish the replacement sidewalk in front of the Venetian from the connecting public sidewalks to its north and south. See Lee, 505 U.S. at 680 ("separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction"). Although the paving and land-scaping along the Venetian's stretch of sidewalk are somewhat different, there are no barriers or other physical boundaries to indicate to the steady stream of pedestrians making their way up and down the Las Vegas Strip that the sidewalk in front of the Venetian enjoys a different legal status than the public sidewalks to which it is seamlessly connected to the north and south: "There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalk[ ] . . . that they have entered some special type of enclave." United States v. Grace, 461 U.S. 171, 180 (1983) (holding that sidewalk surrounding Supreme Court building is a public forum despite legislation declaring the sidewalk to be a non-public forum); cf. Marsh v. Alabama, 326 U.S. 501, 503 (1946) ("The town and the surrounding neighborhood . . . can not be distinguished from the Gulf property by anyone not familiar with the property lines . . . ."); Freedom From Religion Foundation, 203 F.3d at 494 ("[N]o visual boundaries currently exist that would inform the reasonable but knowledgeable observer that the Fund property should be distinguished from the public park."); Gerritsen v. City of Los Angeles, 994 F.2d 570, 576 (9th Cir. 1993) ("While the Olvera Street area[of El Pueblo Park in downtown Los Angeles] may have a special ambience, it is still part of the park and it is indistinguishable from other sections of the park in terms of visitors' expectations of its public forum status."); Citizens to End Animal Suffering, 745 F. Supp. at 71 n.13 ("The similarity of the Marketplace to a municipal park is underscored by the absence of any discernable boundaries between the Marketplace and the immediately-adjacent, public areas . . . .").
 
 
 42
 The Seventh Circuit's opinion in Freedom from Religion Foundation places emphasis on the fact that the .15 acres containing the cross was dedicated to public use. Property that is dedicated to public use is no longer truly private. Although the owner of the property retains title, by dedicating the property to public use, the owner has given over to the State or to the public generally "one of the most essential sticks in the bundle of rights that are commonly characterized as property," the right to exclude others. Dolan v. City of Tigard, 512 U.S. 374, 393 (1994) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979)); see 39 Am. Jur. 2d, Highways, § 183 (1999) (public dedication creates an easement in the public "with fee title to the property remaining in abutting property owners"). The private owner can no longer claim the authority to bar people from using the property because he or she disagrees with the content of their speech. See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 801 (1985) (assuming that public forums may include"private property dedicated to public use"); see also Marsh, 326 U.S. at 506 ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.")
 
 
 43
 The Venetian insists that it has neither dedicated the sidewalk along Las Vegas Boulevard to public use nor conveyed any property interest in the sidewalk to the County or the State. We cannot agree. We note that counsel for the Venetian conceded to the district court that the Venetian has an obligation under the 1999 Agreement not to restrict public access to and passage along the sidewalk. The 1999 Agreement requires the Venetian to "construct and maintain" a "private sidewalk connecting to the public sidewalks on either side of its property." The Agreement states that the sidewalk "shall have a width of ten feet and shall satisfy the Americans with Disabilities Act for the purpose of providing unobstructed pedestrian access" (emphasis added). The agreement also requires the Venetian to remove any improvement it constructs along the sidewalk if the State determines that it is a hazard or an obstruction to pedestrian or vehicular traffic, and the Agreement specifies that if the Venetian ever removes, alters, or abandons the sidewalk, it must dedicate the necessary right-of-way to permit the construction of a replacement public sidewalk. Read together, these provisions constitute a dedication of the sidewalk to public use. They require the Venetian to provide a sidewalk for general public use, and they deprive the Venetian of its private property right to block or otherwise impede public access to the sidewalk.
 
 
 44
 Furthermore, because the 1999 Agreement specifies that it is to be recorded and that it shall bind "the heirs, . . . successors and assigns" of the parties, the Agreement operates as a servitude. See Restatement (3d) of Property (Servitudes) § 1.3 ("A covenant is a servitude if either the benefit or the burden `runs with the land.' "); id. § 2.2 ("Commonly used formulas for stating intent to create servitudes include statements that the interests created `run with the land' or that they `bind' or `inure' to the benefit of `heirs and assigns' or `successors' of the parties."); Roger A. Cunningham et al., The Law of Property § 8.16 (2d ed. 1993) (the use of the word "assigns" is highly persuasive of an intent to create a servitude). Whether the servitude created by the 1999 Agreement is characterized as a restrictive covenant or an affirmative easement does not matter. In either case, as a result of the 1999 Agreement, the State of Nevada possesses a property interest in a portion of the Venetian's land, the purpose of which is to guarantee unrestricted public passage along Las Vegas Boulevard. See Meredith v. Washoe County School District, 435 P.2d 750, 752 (Nev. 1968) (explaining that "a restrictive covenant is an easement or a servitude in the nature of an easement"); Restatement § 2.18 ("[T]he right to control a servitude for the benefit of the public is located in the state and the right to use the servitude benefit extends to the public at large.").
 
 
 45
 We are not persuaded by the interpretation offered by the Venetian on appeal that the 1999 Agreement merely requires the Venetian to provide a sidewalk that complies with the requirements of the Americans with Disabilities Act. The Venetian undoubtedly is required to comply with the ADA, but this requirement is only a part of the Venetian's larger obligation under the Agreement to construct and maintain a private sidewalk "for the purpose of providing unobstructed pedestrian access." The Venetian relies on the final paragraph 6 of the agreement in contending that no dedication to public use occurred. That paragraph states:
 
 
 46
 6. The [Venetian] retains full rights inherent to the ownership of private property to the full extend permitted by the Fifth and Fourteenth Amendment to the United States Constitution and the parties do not intend by this agreement that the DEPARTMENT is taking any state action as to the private sidewalk other than the requirement in paragraphs 1 through 4 under "[Venetian] AGREES" above. (emphasis added.)
 
 
 47
 The key phrase is the one emphasized, because the paragraphs 1 through 4 referred to are the portions of the agreement that provide the dedication to the public.
 
 
 48
 These paragraphs provide for the construction and maintenance of the sidewalk, connecting to public sidewalks on either side of the property, and for the Venetian to maintain and clean the sidewalk so as to "protect pedestrians and the traveling public." Thus, the Venetian retains a property interest other than that dedicated to the public by paragraphs 1 through 4. This type of dedication to the public is an advantage to the Venetian, in that it can beautify the sidewalk and select the material to cover the sidewalk so long as it does not interfere with the dedicated public use.
 
 
 49
 The mere retention of some property interest in the parcel does not affect the public nature of the dedicated use of the sidewalk. As the Supreme Court has recognized, simply declaring an entity to be private "does not alter its characteristics so as to make it something other than what it actually is." Lebron v. National R. Passenger Corp., 513 U.S. 374, 393 (1995) (holding that Amtrak is subject to the First Amendment despite provision in its charter declaring it to be private corporation) (internal quotation and citation omitted).
 
 
 50
 The historically public character of the Venetian's sidewalk, the sidewalk's continued use by the general public, the fact that the sidewalk is connected to and virtually indistinguishable from the public sidewalks to its north and south, and the dedication of the sidewalk to public use all serve to distinguish this case from the two Supreme Court cases relied upon by the Venetian: Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551 (1972), and Hudgens v. NLRB, 424 U.S. 507 (1976). In those cases, the properties at issue--pedestrian"promenades" inside private enclosed shopping centers--were intended solely to be used to facilitate the patronage of the shopping centers' tenants. See Lloyd, 407 U.S. at 553 (describing walkways as "private interior promenades . . . serving the stores"); id. at 564-65 (stating that the invitation extended to the public "is to come to the [Lloyd] Center to do business with the tenants. . . ."). The promenades were not an integral part of "the city's automotive, pedestrian or bicyclists' transportation grid," Chicago ACORN, 150 F.3d at 702, and most importantly, they were never dedicated to public use. See Lloyd, 407 U.S. at 570 (concluding that "there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights"). While the mall owners in Lloyd and Hudgens were free to barricade their walkways, or close their malls outright, without giving patrons any legal ground to complain, the Venetian is not. Even if the Venetian were to close its doors or to be converted into a members-only club or some other non-public enterprise, members of the public would still have the recorded right to pass across the Venetian's property along Las Vegas Boulevard and to express themselves as they do so with the same freedom as on any public sidewalk.
 
 
 51
 The other cases cited by the Venetian can be distinguished on the same bases. The Venetian cites Garrison v. City of Lakeland, 954 F. Supp. 246, 250 (M.D. Fla. 1997), in which the court held that union demonstrators did not have a First Amendment right to picket on a private road leading to a hospital. Unlike the sidewalk in front of the Venetian, however, the road in Garrison was never "dedicated by the City as a public thoroughfare" and served only as "a local access drive maintained by [the hospital] as part of its internal circulation system." Id. at 250. The Venetian also cites Rouse v. City of Aurora, 901 F. Supp. 1533, 1537 (D. Colo. 1995), in which the court held that anti-pornography protestors did not have a First Amendment right to picket on the private shopping center sidewalk in front of an adult book and video store. However, the private sidewalk in Rouse, like the "promenades" in Lloyd and Hudgens, was intended only to provide access to the shopping center's stores. See id. at 1537. There is no indication that the sidewalk was dedicated to general public use. Furthermore, the court states that in addition to the private sidewalk running in front of the stores, the shopping center was "bordered on its far perimeter by a public sidewalk." Id. No such alternative public sidewalk is available in front of the Venetian.
 
 
 52
 In none of the cases cited by the Venetian does the privately-owned property at issue possess all the attributes of a public forum possessed by the sidewalk in front of the Venetian. As a "thoroughfare sidewalk," seamlessly connected to public sidewalks at either end and intended for general public use, the sidewalk in front of the Venetian is "the archetype of a traditional public forum," Frisby, 487 at 480.
 
 IV. CONCLUSION
 
 53
 Given the historically public character of the predecessor's sidewalk, the replacement sidewalk's current public use, its similarity to and interconnection with Las Vegas' network of public sidewalks, and its dedication to public use under the Venetian's 1999 Agreement with the Department, we conclude that the Venetian's sidewalk constitutes a public forum subject to the protections of the First Amendment. Accordingly, we affirm the judgment of the district court.
 
 
 54
 AFFIRMED.
 
 ADDENDUM AGREEMENT
 
 55
 THIS AGREEMENT made this 8th day of January, 1999, between VENETIAN CASINO RESORT, L.L.C., hereinafter referred to as the COMPANY, and the STATE OF NEVADA, DEPARTMENT OF TRANSPORTATION, hereinafter referred to as DEPARTMENT:
 
 WITNESSETH:
 
 56
 Whereas, the COMPANY is constructing a new casino resort and desires to utilize a port of, and to access, the existing right-of-way along Las Vegas Boulevard adjacent to the COMPANY's property in order to build an additional travel lane, modify median islands and build an approach to Las Vegas Boulevard.
 
 
 57
 Whereas, DEPARTMENT is responsible for control of traffic and maintenance of Las Vegas Boulevard, a state highway, and a sidewalk currently exists on DEPARTMENT right-of-way adjacent to the roadway.
 
 
 58
 Now, therefore, the parties to this agreement hereby agree as follows:
 
 COMPANY AGREES:
 
 59
 1. The Company shall construct and maintain on its property along Las Vegas Boulevard South a private sidewalk connecting to public sidewalks on either side of its property. The private sidewalk shall have a minimum width of ten feet and shall satisfy the Americans with Disabilities Act for the purpose of providing unobstructed pedestrian access.
 
 
 60
 2. That the COMPANY will place no improvements in, on, or upon the DEPARTMENT's right-of-way, nor make any use of it except in accordance with the required revocable encroachment permit. (Pursuant to NRS 408.423).
 
 
 61
 3. To use vacuum type cleaners in lieu of water hoses to clean the private sidewalk during non-peak traffic hours in order to protect pedestrians and the traveling public. The area may be washed during hours of light traffic with drainage of water being provided by the COMPANY on premises, with no wash, sprinkler, or nuisance water being allowed to drain onto Las Vegas Boulevard. The sprinklers will be situated such that pedestrians and vehicular traffic are not sprayed by the operation of the sprinkler system.
 
 
 62
 4. To keep and maintain, at its sole expense, the private sidewalk free of all weeds, noxious plants, debris, and inflammable or explosive materials of every description, and at all times in an orderly, clean, safe, and sanitary condition.
 
 
 63
 5. To absolve, indemnify, and defend DEPARTMENT from any and all cost, expense, or liability arising from the construction, maintenance, or use of the private sidewalk and landscaped area, including, but not limited to drainage facilities and planter boxes.
 
 
 64
 6. The COMPANY further agrees to name the DEPARTMENT as an additional insured on its personal liability, and property damage insurance policies.
 
 
 65
 7. To dedicate necessary right-of-way to the DEPARTMENT and to construct thereon a sidewalk, with a minimum width of ten feet, behind the curb and gutter and adjacent to Las Vegas Boulevard at the COMPANY's expense should the private sidewalk be removed, altered, or abandoned, and to construct the sidewalk at least equal to State standards in effect at the time of the restoration. A no fee encroachment permit shall be obtained from DEPARTMENT prior to construction.
 
 
 66
 8. To remove or modify any of the COMPANY's improvements at the COMPANY's expense if they become a hazard or obstruction to either pedestrian or vehicular traffic, as reasonably determined by the DEPARTMENT.
 
 
 67
 9. To maintain all improvements at COMPANY's sole expense. All maintenance activity shall be done during periods of light pedestrian traffic.
 
 IT IS MUTUALLY AGREED:
 
 68
 1. That the DEPARTMENT is not taking any private property interest with this document. The use being permitted is at the request of and for the benefit of the COMPANY and that the DEPARTMENT assumes no liability or risk resulting from said use in the manner proposed.
 
 
 69
 2. That DEPARTMENT retains the right of approval for the landscaped buffer area and new pedestrian walkway construction as contemplated herein.
 
 
 70
 3. This agreement shall constitute the entire contract between the parties hereto, and no modification hereof shall be binding unless endorsed in writing.
 
 
 71
 4. All covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors and assigns, as the case may be, of the respective parties.
 
 
 72
 5. That this agreement shall be recorded.
 
 
 73
 6. The COMPANY retains full rights inherent to the ownership of private property to the full extent permitted by the Fifth and Fourteenth Amendment to the United States Constitution and the parties do not intend by this agreement that the DEPARTMENT is taking any state action as to the private sidewalk other than the requirement in paragraphs 1 through 4 under "COMPANY AGREES" above.
 
 
 74
 IN WITNESS WHEREOF the parties hereto have executed this agreement the day and year first above written.
 
 
 75
 REVIEWED AND VENETIAN CASINO RECOMMENDED BY: RESORT, L.L.C.
 
 
 76
 (Signed) By: (Signed) 
Eugene F. Weight, David Friedman, Secretary
District Engineer
 APPROVED FOR
 LEGALITY AND FORM:
 (Signed) 
 Deputy Attorney General
 
 
 
 Notes:
 
 
 [1]
 The entire agreement is attached as an addendum to this opinion.
 
 
 [2]
 The temporary pedestrian walkway has since been replaced with a permanent sidewalk.
 
 
 [3]
 Nevada Revised Statute § 16.06 requires persons to obtain permits before putting on a special event requiring the closing of a public street or right-of-way.
 
 
 [4]
 The County, the original named defendant in this action, states that it is neutral regarding the public forum status of the sidewalk. The County affirms that it was the desire of the County Commissioners that the Venetian's sidewalk be identified as a public forum, but explains that because it is now before the court in its executive law enforcement capacity, it does not believe it is appropriate to promote its own opinion of what the law should be.
 
 
 [5]
 Paragraph 3 refers to cleaning the sidewalk so as "to protect pedestrians and the traveling public." In Paragraph 8, the Venetian agrees to remove or modify any of the Venetian's improvements if they become a hazzard or obstruction to either pedestrian or vehicular traffic. It is apparent that these provisions refer to the general pedestrian traffic that is to be afforded unobstructed access, not just those with disabilities.
 
 
 [6]
 The Venetian argues that cases such as Kokinda that address whether a sidewalk or other space is a public forum are inapplicable to this case because they all presuppose that the property at issue is government owned. However, while the sidewalk at issue in Kokinda was government owned, this is not true of all Supreme Court public forum cases. See United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132 (1981) (applying public forum analysis to privately-owned mailboxes).
 
 
 BRUNETTI, Senior Circuit Judge, dissenting:
 
 77
 To fully understand the nature of the property in dispute here, it is necessary to scrutinize more closely the history of the Venetian Casino construction and, more specifically and significantly, to compare the two agreements entered into by the Venetian, first with Clark County and then with the State of Nevada.
 
 
 78
 The undisputed facts are as follows: Venetian owns a large block of property in Las Vegas. This property has always been in private hands. In 1997, Venetian obtained approval to demolish the hotel formerly sitting on the property and to construct a new hotel. The new hotel's frontage and main entrance face Las Vegas Boulevard.
 
 
 79
 In February 1997, Venetian entered into negotiations with Clark County and eventually reached a pre-development agreement. The 1997 Agreement contemplated that Venetian would construct certain improvements to alleviate the new hotel's anticipated impact on traffic, and would convey property rights to the County or State if "required to construct the IMPROVEMENTS," including any "public rights-of-way" that might be "needed for [those] systems. " Venetian agreed that "[a]ny conveyance of land" to "the COUNTY or to the State of Nevada, for public use of sidewalks . . . will be for facilitating the perpetual flow of pedestrian traffic, utility easements, public facility easements, and for maintenance purposes of said sidewalks, walkways, and pedestrian passageways, without restrictions." To identify the specific measures that would be required to address "pedestrian safety needs as they relate to public walkways," Venetian agreed to conduct a traffic impact evaluation study for the County's approval and to abide by the Study's recommendations.
 
 
 80
 During a public hearing on the Agreement, several County Commissioners expressed concern that, under this Agreement, the public might not have free speech rights on the sidewalk in front of the Venetian. The response these concerns received was ambiguous. Despite these unresolved concerns about the reach of the First Amendment to the Venetian's property, the County decided not to table the sidewalk issue in order to obtain additional legal guidance and instead voted to approve the Agreement and continue with the traffic impact study.
 
 
 81
 The Study recommended widening Las Vegas Boulevard by one traffic lane along the Venetian frontage. The additional lane would replace an existing public sidewalk, but would also exhaust the State of Nevada right-of-way on Las Vegas Boulevard, leaving no remaining State right-of-way on which to construct a new sidewalk. Any new sidewalk therefore would have to be constructed on Venetian's private property. The final County-approved Traffic Study did not require Venetian to convey any property rights to the State (including any public right-of-way) for a new public sidewalk.
 
 
 82
 Because Las Vegas Boulevard sits on a State-not County-right-of-way, Venetian began negotiations with the Nevada Department of Transportation to address the issue of pedestrian passage along the Venetian frontage on Las Vegas Boulevard. The discussions between Venetian and NDOT produced the 1999 Agreement at issue in this case.
 
 
 83
 The language regarding the sidewalk in the 1999 Agreement stands in marked contrast to that in the 1997 Agreement. Instead of referring to "public property rights, " the Agreement refers to the sidewalk as private six times. In fact, every time the sidewalk is referred to in the contract, it is designated a "private sidewalk." The agreement goes on to distinguish the "private sidewalk" from the "public sidewalks on either side of [Venetian's] property."
 
 
 84
 Furthermore, it is stated that "the Department[of Transportation] is not taking any private property interest with this document. The use being permitted is at the request of and for the benefit of the [Venetian]. . . ." The final clause of the Agreement explicitly states: "The [Venetian ] retains full rights inherent to the ownership of private property to the full extent permitted by the Fifth and Fourteenth Amendment to the United States Constitution."
 
 
 85
 A comparison of these two agreements speaks volumes about the nature of the property in dispute here. It is clear that the County could have (and should have) demanded a full conveyance of the sidewalk. This was in fact part of the earlier 1997 Agreement, but the County and State chose not to enforce that provision in the final agreement with the Venetian. It is significant that, even though the language in the 1997 Agreement which created a public right-of-way provoked concern over the First Amendment, the County and State went ahead and weakened the language in the 1999 Agreement even further. Both sides of this agreement were sophisticated parties who understood the benefits of the bargain. During the course of the negotiations, the County and State chose not to hold up the building of the casino, so as to gain a public right-of-way. They made a calculated decision to change the language of the contract, and we should read the changed language as meaningful. The County and State should not be given by this court property rights that it clearly bargained away. Because I believe the majority does exactly that, I respectfully dissent.
 
 
 86
 "Before deciding whether defendant can be enjoined from prohibiting speech on its premises, the court must undertake a two-step inquiry. First, the court must determine whether this defendant, an ostensibly private party, may be held to constitutional standards when it attempts to regulate activity on its premises. If so, the court must then characterize the forum at issue, thereby setting the constitutional standards by which defendant's regulations are to be judged." Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65, 69 (D.Mass. 1990)(citations omitted). At issue here is the first step of this inquiry: whether Venetian, a private corporation, may be held to the standards of the First Amendment when it regulates activity on its sidewalk.
 
 
 87
 Here, the appropriate test for determining whether a private party's actions are fairly attributable to the State is whether the "private actor has assumed a traditionally public function." Id. at 69 (citing Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982)). The Supreme Court has cautioned that this determination of whether a private party may be subject to constitutional standards is "necessarily fact-bound. " Id. (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 939 (1982) and Burton v. Wilmington Parking Authority, 365 U.S. 715, 722 (1961)). With all due respect to the majority, I believe that a comprehensive analysis of all the facts here leads to exactly the opposite conclusion that it reached: the Venetian is merely a private actor, acting on private land.
 
 
 88
 The "relevant question" under the public function test "is not simply whether a private group is serving a public function," but rather "whether the function performed has been traditionally the exclusive prerogative of the State." Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982)(internal quotation marks omitted)(emphasis added). Here, the Venetian is regulating access to and activity on private property, including a private sidewalk, a "traditionally private function." Tynecki v. Tufts Univ. Sch. of Dental Medicine, 875 F. Supp. 26, 33 (D.Mass. 1994). The only exception to the general rule that private parties can regulate private functions without triggering First Amendment restrictions, recognized by the Supreme Court in Marsh v. Alabama, 326 U.S. 501 (1946), is inapplicable here. In Marsh, the company town performed all municipal functions and therefore was found to be a state actor, as "the [corporate] town . . . does not function differently from any other town." 326 U.S. at 508.
 
 
 89
 In Lloyd Corp. v. Tanner, 407 U.S. 551 (1972), and Hudgens v. NLRB, 424 U.S. 507 (1976), the Supreme Court considered the application of the Marsh exception to sidewalks within private shopping centers. The Court counseled against stretching the "public function" idea to encompass any private area open to the public and bearing a resemblance to a public space. See Lloyd, 407 U.S. at 570 ("[T]he Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens must be respected and protected.") In Lloyd, the Supreme Court made clear that the simple fact of opening up a private space to the public and a functional similarity to "facilities customarily provided by municipalities" do not automatically subject that private property owner to the restrictions of the First Amendment. Id. at 569. "The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use . . . . Nor does property lose its private character merely because the public is generally invited to use it for designated purposes." Id. Instead, the holding of Marsh should be limited to the company town, an "economic anomaly of the past," or at least to situations in which a private property owner assumes the "full spectrum of municipal powers" in a manner similar to the company town. Id. at 561, 569.
 
 
 90
 The majority attempts to maneuver around the Supreme Court's limitation of Marsh and also its clear hesitation to expand the "public function" idea further. They do so by distinguishing the pedestrian "promenades" inside these private enclosed shopping centers as intended solely for access to the center itself, whereas the Venetian's sidewalk is an"integral part of the city's . . . transportation grid." However, this distinction alone does not hold up under scrutiny, as it mimics the functional similarity argument rejected in Lloyd. The mere fact that the Venetian's sidewalk is open to the public generally and therefore performs the same function as a public sidewalk is not sufficient without more to subject the property to constitutional standards. There must be a kind of all-encompassing "assumption or exercise of municipal functions or power" comparable to that in Marsh. Lloyd, 407 U.S. at 569.
 
 
 91
 Therefore, the only possible distinction that can be drawn between the private sidewalks in Lloyd and Hudgens and the Venetian's sidewalk at issue here is a potential dedication of the sidewalk to public use by the Venetian. I agree with the majority that, if the Venetian had truly given the public an explicit right to its property in the 1999 Agreement, then this sidewalk would indeed fall within the ambit of the First Amendment. This is in essence a matter of contract interpretation, and I believe that close scrutiny of the circumstances that led to the contract and the plain language of the contract itself, as well as the history of the piece of property at issue and its physical characteristics, will compel an entirely different conclusion than that arrived at by the majority.
 
 A. Historic Use for Public Expression
 
 92
 The majority only acknowledges in passing the most crucial fact in determining the historical use of this property: the sidewalk was rerouted onto private property. Never before had the ground upon which the sidewalk now sits been used by the public; never before had a sidewalk been placed there. It is, was, and always has been privately-owned property. However, the former sidewalk is now replaced by a highway; it exists no more. The majority glosses over this crucial fact, stating that "[it] is the historical use of the sidewalk adjacent to Las Vegas Boulevard that is significant, not the piece of land on which the replacement sidewalk had to be located." This statement is simply wrong, as the fact that a public sidewalk existed at one time just a few feet away does not convert private property into public property. Any First Amendment analysis as to the requirement of state action must start with the piece of property at issue in the case, and this starting point can not be glossed over by importing in the history of other pieces of property.
 
 
 93
 Therefore, because this sidewalk is on property that is and always has been private, the most compelling cases which hold private property subject to First Amendment protection due to a dedication are inapplicable here. They either involve property that had previously been public or still retained an underlying public character. See Freedom from Religion Foundation v. City of Marshfield, 203 F.3d 487, 490 (7th Cir. 2000) (city converted a portion of a public park into private property, while reserving a covenant running with the land that restricts the use of the parcel to public purposes); Citizens to End Animal Suffering, 745 F.Supp. at 71 n.10 (Faneuil Hall is owned by the City of Boston and leased to private actors with an express easement reserved to the City). In both cases, the property in dispute had at some point been completely public and was converted into a private property interest with an interest retained by the public. Here, that is simply not the case.
 
 
 94
 Furthermore, the majority maintains that they would have been persuaded that Venetian should not be considered as a state actor, if it "fundamentally altered the sidewalk's character or its use by the public." This requirement assumes again that the property in dispute had at some point been public, which it had not. Because the sidewalk is located on property that has always been private, Venetian should not have to do something proactive to signal its private character or else risk falling within the First Amendment. By requiring this of the Venetian, the majority essentially creates a presumption that, if an individual owns private property which looks like it could be public, that person will have to let the public know that its private or else he will be acting as the State.
 
 
 95
 However, even assuming that alteration or separation of its private sidewalk from the surrounding public sidewalks is required of the Venetian, it has amply demonstrated that the sidewalk at issue is markedly different from the public sidewalks to which it connects. It was designed to fit within the design concept of the Venetian, with pavement patterns and light posts matching those of the exterior plaza area of the hotel. The sidewalk seamlessly matches the Venetian and does not match the continuation of the sidewalk on either side. Therefore, "visual boundaries currently[do] exist that would inform the reasonable but unknowledgeable observer that the [Venetian sidewalk] should be distinguished from the [public sidewalk]." Freedom from Religion Foundation, 203 F.3d at 494.
 
 
 96
 It bears noting that every case concerning historical use for public expression cited by the majority relates to the level of protection afforded First Amendment rights, after the state action requirement was satisfied. See., e.g., United States v. Kokinda, 497 U.S. 720, 723 (1990)("The postal sidewalk provides the sole means by which customers of the post office may travel from the parking lot to the post office building and lies entirely on Postal Service property.")(emphasis added); Int'l Society for Krishna Consciousness v. Lee, 505 U.S. 672, 673 (1992)("In this case we consider whether an airport terminal operated by a public authority is a public forum. . . .") (emphasis added); Chicago ACORN v. Metropolitan Pier Exhibition Auth'y, 150 F.3d 695, 702 (7th Cir. 1998) (stating that "[i]f the MPEA were a private entity, it would have a free hand in deciding whom to admit to its property and on what terms . . . . But it is publicly owned, and so its owner, the MPEA, is subject to the First Amendment."). They do not address the issue we face today, whether a private actor has given the public a right to use its property, such that the First Amendment applies to that actor as if he was the State. Instead, they address whether or not a piece of publicly-owned property is a public forum.
 
 
 97
 The majority imports from this misapplied public forum analysis a distinction between non-thoroughfare and thoroughfare sidewalks which has never before been applied to private actors. See Kokinda, 497 U.S. at 727-28. In fact, Kokinda clearly states that the issue before the Supreme Court was the level of scrutiny to apply to the governmental action there, not whether the government was an actor at all: "[t]he Government's ownership of property does not automatically open that property to the public. It is a long-settled principle that government actions are subject to a lower level of First Amendment scrutiny when the government [is] operating . . . as proprietor, to manage its internal operation. " Id. at 725 (internal quotation marks and citations omitted).
 
 
 98
 The majority dismisses this distinction in a footnote, stating that "while the sidewalk at issue in Kokinda was government owned, this is not true of all Supreme Court public forum cases." See footnote 6. However, the majority's characterization of the issue as one of government ownership alone misconstrues the fundamental requirement for a First Amendment analysis, which is state action. The Supreme Court case cited by the majority in their footnote, United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 128 (1981) clearly involved state action, as at issue was a federal statute prohibiting the deposit of unstamped mailings in letter-boxes. Therefore, the First Amendment analysis turned on the Postal Service's enforcement of that statute to all letterboxes. See id. ("What is at issue in this case is solely the constitutionality of an Act of Congress which makes it unlawful for persons to use, without payment of a fee, a letterbox which has been designated an `authorized depository' of the mail by the Postal Service.") Here, the issue is whether the State has acted at all, an issue clearly resolved in Greenburgh.
 
 
 99
 Although this distinction might appear to be an issue of semantics, it has important ramifications for the scope of the First Amendment. It is true that the inquiry as to whether or not a private party is acting as the state will often involve similar factors as the inquiry into what level of protection a piece of property receives, such as the dedication of the property by the private individual to public use. However, the reach of the First Amendment is broadened when we incorporate the public forum analysis within the state action inquiry. Our focus shifts away from whether that specific private actor is actually acting as the state (i.e. when performing a public function) to whether that type of property historically has been used as a public forum. This move broadens the scope of who is a state actor for the purposes of the First Amendment because the inquiry becomes more generalized. No longer do we have to focus on that specific actor acting on that specific property. Instead we will ask: "Is this type of property generally used for public purposes?"
 
 
 100
 Here, the impact of blurring the boundaries becomes apparent, because sidewalks are traditionally public fora. In fact, they are a classical example of the public space. However, that should only matter if they are publicly-owned or publicly-dedicated sidewalks or if the private owner is somehow assuming a public function. If we allow the public forum analysis to creep into the analysis of whether or not the public has a right to a particular piece of property, any private piece of property of a type traditionally owned and operated by the public or which is used in a manner traditionally associated with the public will presumptively satisfy the state action requirement, without any showing at all that the actual private property owners involved acted as the state. This new reading of the First Amendment's state actor requirement will greatly undermine private property rights, as the majority opinion undercuts the ability of private actors to negotiate and determine the rights that apply to their property, if that piece of property happens to be space traditionally construed as public.
 
 B. The Language of the 1999 Agreement
 
 101
 In analyzing whether or not Venetian dedicated the sidewalk to the County or State, a comparison of the language in this contract and the negotiations surrounding it to the contract in Citizens to End Animal Suffering, in which a property right was clearly and explicitly given to the public, exposes the relatively weak argument the appellees present here. In Citizens to End Animal Suffering, the district court enjoined the owners of Faneuil Hall Marketplace, a private corporation, from interfering with the plaintiffs' freedom of expression, because the Hall was performing a public function. There, as stressed by the court, the "lanes on which plaintiffs wish[ed] to protest are encumbered by an easement for public access." Citizens to End Animal Suffering, 745 F.Supp. at 70.
 
 
 102
 That easement is markedly different from the language in dispute in this contract. There, the property was actually owned by the City of Boston and merely leased to the owners of Faneuil Hall Marketplace, Inc. Incorporated in the langauge of the lease was an express easement, in which the City reserved the right of the public for pedestrian access. The langauge in that contract was as such: "The City hereby reserves unto itself . . . a perpetual, non-exclusive easement, for the benefit of and use by the general public, for reasonable, peaceful, and orderly pedestrian access and passage. " Id. at 71 n. 10.
 
 
 103
 In Citizens to End Animal Suffering, the relationship of landlord and lessee created an ongoing relationship between the City and the private individuals, and the City needed only to reserve a right that it already had in the property. In the present case, there is no such relationship; the land on which the sidewalk was erected has always been private. Therefore, the State was not merely holding on to, or reserving, a right that it previously had. It came to the contractual table with no rights in that piece of property, and the Venetian would have had to give over to the State "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Dolan v. City of Tigard, 512 U.S. 374, 393 (1994). But, in the contract with the State, the Venetian gave no dedication or easement for use by the general public as a sidewalk. If we do not demand an even higher showing of express intent in this instance, we should at least require the parties to be as explicit as they were in the reservation contained in Citizens to End Animal Suffering.
 
 
 104
 However, the majority does not. It reads the language "for the purpose of providing unobstructed access" in the 1999 Agreement as creating an express easement for the public. For additional support of that reading, the majority relies on a clause in the Agreement which states that, if the Venetian removes, alters, or abandons the sidewalk, it must then dedicate the necessary right-of-way to permit the construction of a replacement public sidewalk. The majority also points to the recording of the agreement and the language which binds later parties, as evidence of a servitude.
 
 
 105
 There are numerous problems with this analysis. A dedication under Nevada law requires a devotion of the land for public purposes "manifested by some clear declaration of that fact." Shearer v. City of Reno, 136 P. 705, 707 (Nev. 1913). This requires a "showing that [the Venetian ] clearly and unequivocally intended to devote [that portion of the property] to public use." Anderson v. Felten , 612 P.2d 216, 218 (Nev. 1980). The appellees here are required to demonstrate that the Venetian clearly and obviously intended to dedicate that portion of their property to the State of Nevada. This they cannot do. The majority helps them by cobbling together a dedication from various provisions in the contract, while ignoring the great weight of the contractual language demanding the opposite conclusion.
 
 
 106
 First, the overwhelming majority of the 1999 Agreement's language indicates that Venetian and the NDOT agreed that the sidewalk would be wholly private. The sidewalk is always referred to as private, and it is distinguished from the public sidewalks that connect to it. The parties' rights are clearly delineated in the agreement: the Venetian retains"full rights inherent to the ownership of private property," whereas the NDOT does "not tak[e] any private property interest."
 
 
 107
 The majority dismisses these statements as "limited by the terms and conditions set forth elsewhere in the Agreement." However, the majority's interpretation of the contract requires a reading that gives some clauses meaning while rendering the others void. Although the Venetian states that it retains full rights, the majority's interpretation reads this out of the contract. The NDOT states that it has no property interest in the sidewalk, yet the majority gives them an interest anyway. The contract as a whole becomes nonsensical, as one clause is read to trump all the others.
 
 
 108
 Secondly, and most importantly, there is no language in this contract similar to that in Citizens to End Animal Suffering. Nowhere does the Venetian give an "easement" or a "dedication" for public use as a sidewalk. The only clause that could possibly be interpreted as the transfer of a property interest states in its entirety:
 
 
 109
 [Venetian] shall construct and maintain on its property along Las Vegas Boulevard South a private sidewalk connecting to public sidewalks on either side of its property. The private sidewalks shall have a minimum width of ten feet and shall satisfy the Americans with Disabilities Act for the purpose of providing unobstructed pedestrian access.
 
 
 110
 The majority makes much of the fact that Venetian's counsel conceded to the district court that it could not unreasonably obstruct the flow of pedestrian traffic. However, this is creating the proverbial mountain out of a molehill. By the plain language of that clause, Venetian provides pedestrian access to its sidewalk which is unobstructed. The issue is whether or not that condition placed upon the private sidewalk is sufficient to create a dedication for the public and therefore afford First Amendment rights there. As I have discussed herein, I do not think that, under the case law, this contract language is sufficient to treat the Venetian as a government actor.
 
 
 111
 Although the majority finds this line of reasoning unpersuasive and insignificant, I read this language as merely a recitation of the Venetian's obligations under the American Disabilities Act. Under the ADA, any "private entity" operating a "public accommodation" -which encompasses virtually all types of commercial establishments, including a "hotel" -must remove all "architectural barriers" that operate to inhibit access by disabled persons. 42 U.S.C. §§ 12181(7)(A), 12182 (b)(2)(A)(iv). The obligation to "remove barriers" includes "[i]nstalling ramps" and "[m]aking curb cuts in sidewalks and entrances." 28 C.F.R. § 36.304(b)(1), (b)(2). With particular respect to newly constructed public accommodation, moreover, the ADA requires an "unobstructed way of pedestrian passage" to principal areas of the facility from any "exterior approach (including sidewalks, streets, and parking areas)." 28 C.F.R. § 36.403(e)(1). Therefore, this language should be read as indicative of the State's intention to treat Venetian's private sidewalk no differently than any other private sidewalk fronting a commercial establishment.
 
 
 112
 Finally, even if this language can be read as something more than compliance with the ADA, it is not a dedication of a right-of-way or an easement. Instead, as Venetian argues, it seems more akin to any restriction placed upon planned construction, such as a requirement to maintain a parking lot adjacent to the sidewalk. Venetian is required by the language of the contract to maintain a "private sidewalk. " As long as it does so, Venetian retains full private property rights in that sidewalk. If it removes the private sidewalk, it must replace it with a dedicated right-of-way.
 
 
 113
 The majority relies on the clause concerning possible alteration or destruction of the current sidewalk by the Venetian and the subsequent dedication to indicate that a dedication is already in place. A straightforward reading of the contract indicates otherwise. If the State already had a dedication, then the clause would only have to indicate that, if the Venetian interfered with its dedication, it would be violating its obligations under the contract. Instead, the language states that, "should the private sidewalk be removed, altered, or abandoned," then Venetian would be obligated to "dedicate [the] necessary right-of-way to the Department." The plain langauge clearly indicates that a dedication does not currently exist, and it is only in the event that Venetian destroys its private sidewalk that it will then have to give over a dedication.
 
 
 114
 This reading is buttressed by the lifespan of dedications under Nevada law. "According to the great weight of authority a dedication . . . is irrevocable, and the dedicator is forever concluded from exercising any authority or setting up any title to the same." Shearer, 136 P. 705, 710. If this clause is a dedication and, as the majority believes, it binds the Venetian's heirs and successors under the contract, then it should be irrevocable and eternal. The Venetian would be unable to take it away, rendering the clause creating a dedication under certain circumstances (such as destruction or alteration of the private sidewalk by the Venetian) superfluous. A common-sense reading of that clause only gives the NDOT a dedication if certain events occur, and conversely, if these events do not occur, the NDOT does not have a dedication.
 
 
 115
 It is axiomatic that the First Amendment only applies to state actors and therefore that the Constitution does not provide protection or redress against abridgement of free expression by private individuals or corporations. However, the majority opinion seemingly ignores this fundamental axiom and today applies the First Amendment to a private corporation's regulation of its own private sidewalk, which was built on a portion of the property that had always been private. To arrive at this curious result, the majority relies on case law which does not address the issue of state action, but rather focuses on whether private land can be a public forum, an issue that we can only reach after finding a state actor. Furthermore, the majority misconstrues the historical nature of the property in question and relies on a misinterpretation of the 1999 Agreement and the negotiation and facts surrounding the entry into that contract. In essence, the majority collapses the past [the public sidewalk on Las Vegas Boulevard] and the future [a contractual provision requiring the Venetian to build a dedicated sidewalk if the Venetian destroys this one] to create the present property right. In doing so, the majority has extended the First Amendment far beyond its intended reach and has undermined the rights of private property owners. For these reasons, I respectfully dissent.