# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-1115

HARLAN L. JACOBSEN,

*Plaintiff-Appellant,*

v.

ILLINOIS DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 3099—**Jeanne E. Scott**, *Judge.*

_____

ARGUED NOVEMBER 1, 2004—DECIDED AUGUST 17, 2005

_____

Before CUDAHY, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* *Single Scene*, *Solo RFD*, and
*Country Singles* are a few of the magazines Harlan L.
Jacobsen distributes through coin-operated newsracks at
highway rest areas across the country. Although he has
been flouting them for nearly a decade, Jacobsen considers
the Illinois Department of Transportation's (IDOT) news-
rack regulations overbearing and unconstitutional. Indeed,
he is convinced that the regulations, which require him to
place his newsracks in a particular part of the rest areas,

pay five cents per newspaper sold, keep the racks in decent condition, and label them with a phone number, transform Illinois's highway rest areas into "First Amendment Free Zones." Seeking a remedy to this perceived injustice, Jacobsen filed a claim under 42 U.S.C. § 1983 against various state officials and asked the district court permanently to enjoin the state from enforcing its regulations against him. After a bench trial, the district court granted the state officials' motion for judgment as a matter of law and denied Jacobsen's request for an injunction with respect to everything except the five-cent fee requirement. We agree with these conclusions and therefore affirm the court's judgment.

## I

Jacobsen is no stranger to the federal courts. With varying degrees of success, he has sued all across the country to protect his right to distribute his magazines without being fettered by petty regulations. See *Jacobsen v. U.S. Postal Service*, 993 F.2d 649 (9th Cir. 1992) (post offices); *Jacobsen v. U.S. Postal Service*, 812 F.2d 1151 (9th Cir. 1987) (same); *Jacobsen v. City of Rapid City*, 128 F.3d 660 (8th Cir. 1997) (airport terminal); *Jacobsen v. Harris*, 869 F.2d 1172 (8th Cir. 1989) (city sidewalks); *Jacobsen v. Crivaro*, 851 F.2d 1067 (8th Cir. 1988) (same); *Jacobsen v. Bonine*, 123 F.3d 1272 (9th Cir. 1997) (highway rest areas); *Jacobsen v. Howard*, 109 F.3d 1268 (8th Cir. 1997) (same). Despite this experience (he normally proceeds *pro se*), Jacobsen has not learned the importance of following certain rules of appellate procedure. He did not submit a statement of facts to this court, in violation of Federal Rule of Appellate Procedure 28(a)(7), nor did he order a transcript of the proceedings below, as permitted by Federal Rule of Appellate Procedure 10(b). As we will explain shortly, these oversights prevent us from questioning the heart of the district court's conclusion.

Although we do not have an adequate record before us, we can glean the gist of the underlying facts from the district court's opinion. In late December 1995, Jacobsen and then-Secretary of IDOT, Kirk Brown, signed a document titled, Rest Area Distribution Agreement (Agreement). The Agreement granted Jacobsen a nonexclusive right to place newspaper racks in public rest areas along Illinois's interstate highways, provided that he maintain the racks, place a decal on each rack identifying the person to call in the event of operating difficulties, pay IDOT a five-cent fee for each newspaper sold, and give IDOT ten days' notice before installing a rack at a particular rest area. IDOT retained the authority to remove or relocate the racks for any reason so long as it gave Jacobsen ten days' notice, an explanation, and an opportunity for Jacobsen to respond. The Agreement also gave IDOT an unqualified right to determine where within the rest area Jacobsen could place the racks. Jacobsen signed the Agreement grudgingly, writing beneath his signature, "Signed under protest that requiring a contract is a prior restraint on a protected activity and a fee requirement is a violation of a constitutionally protected right of the free press to distribute printed material on a public sidewalk or activity compatible public area."

Soon after signing the agreement, Jacobsen's magazines began gracing Illinois's rest areas. Although IDOT had designated particular locations within the rest areas for all newsracks, Jacobsen thought that these locations were undesirable. Instead, he preferred to place his rack beside the front doors of the rest areas' main buildings, and he did so. He also refused to pay the five-cent fee mentioned in the Agreement. For seven years, Jacobsen and IDOT were in a stand-off: Jacobsen did not pay the required fees and repeatedly put his racks in an unapproved location, and IDOT employees just as regularly moved the racks back to the designated areas. In February 2002, Jacobsen sent three emails to IDOT complaining that his racks were being

moved in violation of his First Amendment rights. IDOT responded by informing Jacobsen that it had the right to determine where the newsracks should be placed. Following the protocol set forth in the Agreement, however, IDOT told Jacobsen his newsracks could remain where he had placed them, pending a letter from IDOT giving him ten days' notice of its intent to move the racks back to the designated areas.

Jacobsen was not appeased. On February 27, 2002, he wrote letters to the Illinois Governor, IDOT Secretary, and IDOT Rest Area Administrator, informing them that "the state of Illinois is repeatedly violating our First Amendment constitutionally protected right to distribute newspapers on public sidewalks at Illinois Interstate rest areas." In response, IDOT sent Jacobsen a letter informing him that he was not in compliance with the Agreement because he (1) failed to give ten days' notice of his intention to place newsracks at the rest areas; (2) did not position his newsracks in the locations IDOT had designated; (3) did not place a decal on the newsracks listing the person to call if problems occur; (4) did not maintain the newsracks in good condition; and (5) had not paid IDOT the five-cent newspaper fee. The letter told Jacobsen to correct these deficiencies and informed him that the letter served as notice that IDOT intended to relocate his racks.

Instead of providing evidence to IDOT explaining why it should leave his racks alone, Jacobsen sued, seeking a preliminary and permanent injunction to stop IDOT from enforcing its regulations. As Jacobsen told the district court, "I do not negotiate over constitutional rights." Jacobsen also sought damages under 42 U.S.C. § 1983 from the Governor, the Secretary of IDOT, and IDOT's Roadside Maintenance Manager.

The district court denied the preliminary injunction after a hearing in May 2002 and denied in part and granted in part the permanent injunction after a bench trial in Novem-

ber 2003. The court concluded that highway rest areas were nonpublic fora designed to improve highway safety by providing the traveling public with places to rest, use restrooms, and secure travel information. It found that the regulations were content-neutral and all but the five-cent fee were reasonable in light of the purpose of the forum. The court enjoined IDOT from collecting the five-cent fee, finding it unreasonable because it did not bear any relation to the administrative cost of allowing newsracks at rest areas. Since Jacobsen barely was making a profit through the newsracks, the court determined that the five-cent fee would drive him out of business in Illinois. The state does not appeal the court's decision. The court granted the individual defendants' motion for judgment as a matter of law on Jacobsen's § 1983 claims against them, because he presented no evidence showing that these individuals had either knowingly caused a violation of his constitutional rights or acted in deliberate disregard of those rights.

## II

For First Amendment purposes, the strictness of our review depends on the type of forum being regulated. If the state is regulating expression at traditional public fora, such as streets, sidewalks, or parks "that by long tradition or government fiat have been devoted to assembly and debate," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983), we will uphold time, manner, or place restrictions only if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45. Because a principal purpose of public fora is the free exchange of ideas, more onerous regulations, such as an absolute prohibition on a particular type of expression, will be upheld only if it is necessary to serve a compelling state interest and is narrowly drawn to achieve

that interest. See, *e.g.*, *Cornelius v. NAACP Leg. Def. and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). We apply the same strict standards when the state has intentionally designated an area a public forum. *Id.* On the other hand, if the record reveals that the regulations concern only non-public fora, "[t]he challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's views." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); see also *Perry*, 460 U.S. at 46. "The Government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *United States v. Grace*, 461 U.S. 171, 178 (1983) (quoting *Adderly v. Florida*, 385 U.S. 39, 47 (1966)).

In this case, Jacobsen argued that since he was placing his racks on the sidewalks within the rest areas, the court should analyze the case as if the racks were placed within a public forum. The district court disagreed. It found that "rest area sidewalks are not typical sidewalks, in that they are not accessible to general pedestrian traffic." In coming to this conclusion, the court relied on Ninth and Eleventh Circuit decisions, which had characterized other states' interstate highway rest areas as nonpublic fora. See *Jacobsen*, 123 F.3d at 1274; *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991). As the Eleventh Circuit said in *Sentinel*, "[a]s components of the Interstate System, safety rest areas are hardly the kind of public property that has by long tradition or by governmental fiat . . . been devoted to assembly and debate. . . . [A]s modern phenomena, rest areas have never existed independently of the Interstate System; they are optional appendages that are intended, as part of the System, to facilitate safe and efficient travel by motorists along the System's highways." 936 F.2d at 1203 (quotation omitted). For similar reasons, the district court here declined to de-

clare interstate rest areas intentionally designated public fora; the "government . . . has provided rest areas as a safety measure, not for public recourse."

The district court's conclusion, as well as the Ninth and Eleventh Circuit opinions on which it draws so heavily, has some appeal. It is consistent, for instance, with the characterization of airport terminals as nonpublic fora that the Supreme Court adopted in *Krishna Consciousness*, 505 U.S. at 683. But, in light of the skimpy record, we decline at this juncture to endorse a conclusion that all interstate rest areas are necessarily nonpublic fora. The *Krishna Consciousness* Court itself emphasized the need for case-by-case examination of the question whether "the transportation necessities are compatible with various kinds of expressive activity." *Id.* at 681. As we noted earlier, Jacobsen did not order a transcript of the district court proceedings, failed to provide a statement of facts within his brief before this court, and, from what we can tell, proceeded on a record devoid of detail, resting almost entirely on bare accusations.

As it is a novel issue before this court, we do not want Jacobsen's tactics to foreclose future litigants from developing a more thorough record that might convince us that a particular highway rest area (or even all such areas) are best characterized as public fora. According to the Federal Highway Administration, the Interstate Highway System contains over 46,000 miles of road, serving over 190 million licensed drivers. See Federal Highway Administration, Highway Statistics, 2003, available at http://www.fhwa.dot.gov/policy/ohim/hs03/index.htm. With so many drivers on the road, highway rest areas may be the perfect place to distribute certain types of information, express a particular opinion, or gather with like-minded individuals. While rest areas may not have traditionally been conceptualized as public fora, it is conceivable to us that over time their role may have evolved to a status that deserves greater protection. Tradition, after all, is an ever-

shifting variable. For present purposes, in light of Jacobsen's failure to develop an adequate record on the issue, we assume without deciding that the interstate rest areas about which he is complaining are nonpublic fora.

So long as the regulations are viewpoint-neutral, as Jacbosen concedes they are here, the state may impose "reasonable" time, place, or manner restrictions at nonpublic fora. *Cornelius*, 473 U.S. at 806. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808 (emphasis in original).

With the exception of the five-cent fee requirement, the district court found IDOT's regulatory scheme reasonable. We agree. First, IDOT requires each vendor to enter into an agreement, setting forth the applicable regulations. If IDOT administrators retained the authority to reject a vendor based on its content, this predistribution agreement could constitute an unconstitutional prior restraint. See *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."). If, however, the pre-speech permit, license, or contract is content-neutral and serves only to ease administrative concerns, it will rarely be unconstitutional. See, *e.g.*, *Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953) ("[T]he license required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved."). IDOT's requirement that vendors enter into a predistribution agreement is a content-neutral, routinized mechanism for IDOT to inform vendors of the state's applicable regulations. It enables IDOT to keep track of the number of vendors operating at each rest area. As such, it easily falls on the permissible side of the line.

Second, IDOT requires all newsrack operators to give the state ten days' notice of their intent to place a newsrack at a particular rest area. Again, we find this regulation reasonable so long as there is no evidence (as there is none here) that it is anything but content-neutral. Ten days' notice allows the state to keep track of the number of newsracks at each location and ensures that IDOT has time to accommodate a change in the number of racks at any particular rest area.

Jacobsen's most vehement disagreement concerns the third regulation: IDOT's retention of the authority to determine where within each rest area the newsracks will be located. Jacobsen wants to place his racks in high-traffic areas (beside building doors, for example) and does not want to mingle his racks with all the others. Jacobsen argues that if the garbage cans do not create a safety hazard when they are placed beside the doors, neither would his newsracks. The clear flaw in this reasoning is that if Jacobsen wants to place his racks beside the doors so that he can garner more sales, other vendors will want to be beside the doors as well. While a single garbage can might not be an encumbrance, a garbage can surrounded by newsracks could be. With no evidence that the racks of all the vendors are tucked away so that rest area users cannot find them, we cannot call this regulation unreasonable either. Indeed, it bears a close resemblance to the size and ad placement regulations on newsracks that we upheld over a First Amendment challenge in *Chicago Observer, Inc. v. City of Chicago*, 929 F.3d 325, 328-29 (7th Cir. 1991).

The remaining two regulations—that the vendor must maintain the rack and label each rack with a telephone number—are straightforward. It is reasonable for IDOT not to want potentially hazardous, broken-down newsracks ornamenting the state's rest areas. Likewise, it is reasonable for IDOT to require vendors to label the racks with a phone number. Customers may use the number to seek lost

change; IDOT may use the number to identify which newsrack belongs to which vendor.

As for Jacobsen's § 1983 claims against the individual defendants, he must show that in their supervisory role, they "knowingly, willfully, or at least recklessly" caused a deprivation of his First Amendment rights. See *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). Here, the only possible act supported by the record that could have infringed Jacobsen's First Amendment rights was IDOT's requirement that he pay five cents for every magazine he sold at the rest areas. Independent of Jacobsen's failure to present any evidence establishing the individual defendants' culpability, his argument is tenuous, as he has never paid the five-cent fee. Perhaps a different person could show that the mere threat of the fee stifled her expression, but Jacobsen presents no evidence of this. In fact, all evidence suggests the opposite. Since we have found that Jacobsen failed to demonstrate constitutional problems with IDOT's remaining regulations, his § 1983 claims against the individual defendants were properly dismissed.

### III.

For these reasons, we AFFIRM the judgment of the district court.

No. 04-1115                                                11

**A true Copy:**

    **Teste:**

                            _____
                            *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*