[No. 78579-1. En Banc.]
Argued June 13, 2006. Decided April 26, 2007.

Beth Sanders et al., *Appellants*, v. The City of Seattle et al., *Respondents*.

*Randy P. Baker* (of *Law Office of Randy Baker*), for appellants.

*David J. Burman* and *Rebecca S. Engrav* (of *Perkins Coie, LLP*) and *Thomas A. Carr, City Attorney*, and *Carlton W.M. Seu, Assistant*, for respondents.

¶1 MADSEN, J. — Defendants Westlake Center Associates Limited Partnership and Rouse-Seattle, LLC (Rouse), and the city of Seattle (City) entered into a contract providing a public easement to the City for access to the monorail station located in downtown Seattle. Beth Sanders and William and Patricia Daugaard (collectively Plaintiffs) filed a complaint for injunctive and declaratory relief against the defendants for actions taken by Westlake Center security personnel restricting their right to speech on February 15, 2003 inside the Westlake Center on property

subject to the City's easement. Several issues are presented in this review, including whether the property subject to the City's easement is a public forum, whether the conduct of security personnel infringed on the Plaintiffs' free speech rights under the Washington Constitution, and whether Plaintiffs may bring a facial challenge to the easement contract. We conclude that the property subject to the City's easement located in the interior of Westlake Center is not a public forum, that Rouse's oral policy in effect on February 15, which required persons using the interior public easement to hold stick-mounted signs down, is a reasonable regulation on speech, and that a facial challenge to the easement contract is not available under the circumstances presented. Accordingly, we affirm the trial court.

## FACTS

¶2 On February 15, 2003, a demonstration against the United States war in Iraq was planned for the Seattle Center. Prior to the demonstration, large numbers of people entered Westlake Center in order to ride the monorail to the Seattle Center. Among those entering Westlake Center were Plaintiffs Beth Sanders and William and Patricia Daugaard. The Daugaards shared a sign, mounted on a stick, stating, "No War Around the World, No War in Iraq, Not in Our Name." Sanders held a sign, also mounted on a stick, reading, "No Iraq War." The lines for the monorail were long and the Daugaards decided to find other transportation to the Seattle Center. As they descended on the escalators, they were asked repeatedly to lower their signs by the Westlake security guards. They declined to do so and proceeded out of the Westlake Center. Ms. Sanders, holding her sign high for all to read, decided to wait in the line. She was asked repeatedly by Westlake security to lower the sign, but she declined. She was then advised that she was banned from the Westlake Center. Eventually, she lowered the sign, resting the stick on the ground. She then boarded the monorail. No formal action was taken barring Sanders from the Westlake Center.

¶3 Defendant Rouse owns and operates Westlake Center, a privately owned urban shopping mall in downtown Seattle. The City contracts with the Seattle Monorail Services, which is a private company, to operate the monorail, a limited form of public transportation connecting the downtown area with the Seattle Center. The City owns the monorail station, attached to the exterior of the third floor level of the Westlake Center. Westlake Center owns a boarding platform that connects the station to the shopping center.

¶4 Annually, visitors at the Westlake Center exceed 8.0 million people; approximately 2.4 million people access the monorail through the Westlake Center. There are three access points for the monorail station: (1) an enclosed staircase attached to the exterior of Westlake Center, (2) an elevator attached to the exterior of Westlake Center, and (3) internal escalators ascending three floors and a hallway that exits through a set of glass doors that open onto the monorail station platform. All three of these options for reaching the monorail station were available on February 15, 2003.

¶5 Rouse, as owner of Westlake Center, executed an agreement with the City, granting the City an easement to the boarding platform and to the three routes accessing the platform as described above. There are no signs or barriers marking the boundaries of the areas subject to the easement. The particulars of the easement are contained in the "Monorail Operating and Easement Agreement" (Agreement). Clerk's Papers (CP) at 138 (Ex. C). In part, the Agreement provides:

(b) Associates, as Grantor, hereby grants to the City, as Grantee, for the benefit of the Monorail Station, an easement in the Monorail Station Platform and those portions of the Improvements shown on Exhibit D as the Interior Accessway and Exterior Accessway (as the same may be actually constructed pursuant to this Agreement and the contract) (collectively "Accessways") *for the purpose of pedestrian access between the Improvements and Monorail Station,* in accordance with the

purpose for which said Accessways are designed and subject to the provisions of Section 9 below.

¶6 Section 9 provides:

(a) Unless required by law, no person shall be permitted to do any of the following in or about any part of the Easement Areas without the consent of both of the parties:

(i)(A) With respect to the Accessways, parade, rally, patrol, picket, demonstrate or engage in any conduct that might tend to interfere with or impede the use of the Accessways or Monorail Station Platform by persons entitled to use the same, create a disturbance, attract attention or harass, disparage or be detrimental to the interests of any of the retail or business establishments within the Improvements; and (B) with respect to the Monorail Station Platform, parade, rally, patrol, picket, demonstrate or engage in any conduct that would tend to obstruct, hinder or impede the egress or ingress to the Monorail System or Accessway.

*Id.* at 142-44 (emphasis added).

¶7 In anticipation of the February 15 protest, Westlake Center security personnel instituted an oral policy that would allow protestors with mounted signs to enter the interior of the Westlake Center, using the easement to access the monorail. However, security personnel were instructed to contact any person within the center holding a sign aloft, swinging a mounted sign, or otherwise using a mounted sign in any way that appeared to threaten the safety of others in the center. CP at 116 (Decl. of Frank Kampsen). The oral policy in effect that day differs from the written policy of the Westlake Center, "Westlake Center Free Speech and Public Safety Policy." CP at 135 (Ex. B). That policy provides for public expression on the public plaza surrounding the Westlake Center, limited only by the caveat that "[a]ffixing signs to Westlake Center and other acts of vandalism are not permitted." *Id.* at 136. Public expression inside the Westlake Center is also permitted under the policy, but the policy "prohibits signs that are affixed to poles or sticks and any other sign that poses a

safety threat." *Id.* Finally, the policy provides for public expression on the monorail platform as follows:

1. Westlake Center operates the elevated platform that serves as the boarding area for the Seattle Center Monorail. The Center is responsible for the safety of individuals on that platform. Anyone who refuses to follow the instructions of Westlake Center employees will be required to leave the platform.

2. Monorail riders may carry signs that are prohibited within Westlake Center, but such signs must be held in a manner that minimizes the danger they pose. For example, signs on yardsticks must be carried low to the ground and close to the body of the person holding the sign. Similarly, no sign may be held in a manner that obstructs public passageways, that blocks views of exits, or that otherwise threatens the safety of individuals riding the Monorail.

3. *Monorail riders who wish to carry signs that are prohibited within Westlake Center must travel to and from the elevated monorail platform by using the elevator or the staircase that directly connects the elevated platform to the ground.*

CP at 137 (emphasis added).

¶8 During the day of February 15, Westlake security personnel observed several incidents inside Westlake Center. CP at 118 (Decl. of Frank Kampsen). "I personally witnessed several occasions on which patrons of Westlake Center were nearly injured by mounted signs. These 'near misses' involved mounted signs that people left lying on the floor as well as mounted signs that people wielded carelessly as they walked through the mall, rode the escalators, and stood in line for the Monorail." *Id.* at 118.

¶9 Plaintiffs filed the current action in King County Superior Court on June 13, 2003, alleging violations of their rights to freedom of expression, to petition, to due process, to freedom of assembly, and to equal treatment under the Washington Constitution, article I, sections 3, 4, 5, and 12 by Defendants Rouse and the City. On December 16, 2004, the trial court granted summary judgment to all Defendants and denied Plaintiffs' cross-motion for summary

judgment. The trial court held that the easement portion of Westlake Mall is properly characterized as a nonpublic forum. As such, the restriction on mounted signs imposed by the oral Westlake Mall policy followed on February 15, 2003 was reasonable in light of the purpose of the forum and all the surrounding circumstances. Alternatively, the court ruled that even if the easement area inside the Westlake Center was a traditional public forum, the restriction constituted a valid time, place, and manner restriction. Finally, the court declined to consider Sanders' overbreadth challenge to the Westlake Center Free Speech and Public Safety Policy and the Agreement because it was untimely and the plaintiffs' lacked standing.

¶10 Notice of appeal was filed in the Court of Appeals on February 2, 2005 and, on April 20, 2006, Commissioner Crooks signed an order transferring the appeal to this court pursuant to RAP 4.4.

## ANALYSIS

■■ ¶11 In this case, we are reviewing a grant of summary judgment and thus we apply the same standard as the trial court. *Stalter v. State*, 151 Wn.2d 148, 155, 86 P.3d 1159 (2004); *Clawson v. Grays Harbor Coll. Dist. No. 2*, 148 Wn.2d 528, 536, 61 P.3d 1130 (2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Here, the facts are undisputed, and we decide whether as a matter of law summary judgment was properly granted. *Clawson*, 148 Wn.2d at 536, 546.

¶12 Plaintiffs contend that the trial court erred in granting defendants' summary judgment motion because the easement area inside Westlake Center is a traditional public forum and the restriction on free speech imposed by the defendants does not serve a compelling state interest and is not narrowly tailored as required in a public forum.

As a result, Plaintiffs claim their right to freedom of speech guaranteed by the Washington Constitution, article I, section 5 was abridged.

¶13 Our state constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." CONST. art. I, § 5. In reviewing a free speech challenge to a government regulation, the level of judicial scrutiny is determined by the category into which a specific type of property falls. *See*, *e.g.*, *City of Seattle v. Mighty Movers, Inc.*, 152 Wn.2d 343, 350-51, 96 P.3d 979 (2004); *City of Seattle v. Huff*, 111 Wn.2d 923, 926, 767 P.2d 572 (1989). Therefore, an analysis of the " 'character of the property at issue' " is necessary to determine the constitutional validity of a regulation that attempts to limit expressive activity. *Mighty Movers*, 152 Wn.2d at 350 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'ns*, 460 U.S. 37, 44, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983).

¶14 Although this court has recognized that the free speech clauses of the state and federal constitutions are different in wording and effect, we have adopted the federal analysis to determine whether a particular class of public property is a traditional public forum under our state constitution. *See*, *e.g.*, *Mighty Movers*, 152 Wn.2d 343; *Huff*, 111 Wn.2d at 928; *Bering v. SHARE*, 106 Wn.2d 212, 234, 721 P.2d 918 (1986); *Collier v. City of Tacoma*, 121 Wn.2d 737, 747-48, 854 P.2d 1046 (1993). Moreover, when interpreting our state constitution, we have held that federal case law interpreting federal constitutional provisions is persuasive, though not binding, precedent. *Mighty Movers*, 152 Wn.2d at 353.

¶15 It is well settled that the government need not permit all forms of speech on property that it owns and controls. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 101 S. Ct. 2676, 69 L. Ed. 2d 517 (1981). At one end of the spectrum are streets and parks, which " 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for

purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n,* 460 U.S. at 45 (quoting *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)); *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 813, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). The Supreme Court has expressly "rejected the view that traditional public forum status extends beyond its historic confines." *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 678, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998). Further, the Supreme Court has articulated an additional consideration for determining what constitutes a traditional public forum: "a traditional public forum is property that has as 'a principal purpose . . . the free exchange of ideas.'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S. Ct. 2711, 120 L. Ed. 2d 541 (1992) (plurality opinion) (alteration in original) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). In *Mighty Movers* this court applied the federal test for determining a public forum, concluding that utility poles are not a traditional public forum.

¶16 In a traditional public forum, the government may enforce a content-based exclusion only if it can show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey v. Brown,* 447 U.S. 455, 465, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980). The State may also enforce regulations of the time, place, and manner of expression, which are content neutral if the regulations are narrowly tailored to serve a *significant* government interest and leave open ample alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989); *Vincent,* 466 U.S. at 805; *Perry Educ. Ass'n,* 460 U.S. at 45; *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Under the broad language of article I, section 5, we have held that restrictions on speech in a public forum can be imposed only on a showing of a

compelling governmental interest. *Collier*, 121 Wn.2d at 747-48 (citing *Bering*, 106 Wn.2d at 234).

¶17 There is a second category of fora consisting of public property which the State has opened for use by the public as a place for expressive activity. The constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981) (university meeting facilities); *City of Madison Joint Sch. Dist. v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 97 S. Ct. 421, 50 L. Ed. 2d 376 (1976) (school board meeting); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) (municipal theater). As long as a state holds the facility open to the public as a place for expressive activity, it is bound by the same standards as apply in a traditional public forum.

¶18 Finally, government property may be considered a nonpublic forum when it is not a traditional public forum and has not been designated by government as a forum for public communication. As the Supreme Court has observed, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Greenburgh Civic Ass'ns*, 453 U.S. at 129. ' "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Id.* at 129-30 (quoting *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976)); *Mighty Movers*, 152 Wn.2d at 360 ("Utility poles are an essential part of the City's power system and they have not been a traditional public forum nor have they been historically held open to the general public.").

¶19 We apply the same standard under article I, section 5 for speech in a nonpublic forum as is applied under the First Amendment. *Mighty Movers*, 152 Wn.2d at 349. "Speech in nonpublic forums may be restricted if ' ". . . the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." ' " *Huff*, 111

Wn.2d at 926, 928 (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 32, 759 P.2d 366 (1988) (quoting *Cornelius*, 473 U.S. at 806)). The State may also impose reasonable time, place, and manner restrictions. *Perry*, 460 U.S. at 46; *Jacobsen v. Ill. Dep't of Transp.*, 419 F.3d 642, 648 (7th Cir. 2005).

 ¶20 Generally, courts looking at the question of whether government owned property is a public forum have considered whether a "principal purpose" of the property is the free exchange of ideas, whether the property shares the characteristics of a traditional public forum, and the historical use of the property. *See, e.g., United States v. Kokinda*, 497 U.S. 720, 728, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (plurality opinion) (distinguishing between walkway leading from parking area to front door of post office "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office" and "thoroughfare" sidewalk running parallel to street and holding that the latter, but not the former, is a traditional public forum, *id.* at 727); *Jacobsen v. Bonine*, 123 F.3d 1272, 1274 (9th Cir. 1997) (concluding that interstate rest areas are not public fora because rest areas are "modern creations" and are " 'hardly the kind of public property that has by long tradition . . . been devoted to assembly and debate' " (internal quotation marks omitted) (quoting *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991))); *Chi. Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) (holding that Chicago's Navy Pier was not a traditional public forum because "[t]he sidewalks [on the pier] are not through routes; they lead only to the pier facilities themselves. . . . The pier itself is a discrete, outlying segment . . . rather than a right of way."); *Freedom From Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 494 (7th Cir. 2000) ("whether a property has historically been used for public expression plays an important role in determining if the property will be considered a public forum"); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749 (6th Cir. 2004) ("[t]here is no evidence in the record

in this case that indicates that Ohio intended to open up nontraditional forums such as schools and privately-owned buildings for public discourse merely by utilizing portions of them as polling places on election day"). In determining that utility poles do not constitute a traditional public forum, this court in *Mighty Movers* considered whether a principal purpose of utility poles is the free exchange of ideas, whether utility poles share the characteristics of a traditional public forum, as well as the historical use of utility poles. 152 Wn.2d at 358-59.

¶21 Initially, Plaintiffs contend that the "primary function and purpose" standard set forth in *International Society for Krishna Consciousness*, 505 U.S. 672, and *Mighty Movers*, 152 Wn.2d 343, is mere dicta and flawed. They argue that Rouse and the City must provide concrete evidence that free expression is incompatible with the purpose of the property. Plaintiffs point to language in *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092 (9th Cir. 2003) (*ACLU*) purporting to reject a "primary function and purpose" standard ("The fact that the primary use of the property is not as a park or public thoroughfare is irrelevant as long as there is no concrete evidence that use for expressive activity would significantly disrupt the principal uses.") *Id.* at 1101-02 (emphasis omitted). Plaintiffs argue that whether expression is a principal purpose of the easement is irrelevant and the location of the easement is immaterial. Appellants' Reply Br. at 6.

¶22 Plaintiffs contend that the focus in a public forum analysis, as announced by the Ninth Circuit, is twofold: "[f]irst, and most significantly, there is a common concern for the compatibility of the uses of the forum with expressive activity . . . . Secondly, the case law demonstrates a commitment by the courts to guarding speakers' reasonable expectations that their speech will be protected." *ACLU*, 333 F.3d at 1100.

¶23 Applying what Plaintiffs assert is the forum test from *ACLU*, they contend that there is no evidence that use

of the easement here for expressive conduct is incompatible with the primary use of the interior of the Westlake Center taken as a whole. Plaintiffs also claim that the trial court erred in failing to consider their expectation that picketing in the Westlake Center is protected.

¶24 Plaintiffs misstate the focus of the forum inquiry. First, requiring proof of incompatibility between the expression and the function of the forum assumes that the property is a public forum. *Cornelius,* 473 U.S. at 808 ("In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated."). Further, it is incorrect to consider the primary use of the Westlake Center. Rather, it is the purpose of the government property at issue that matters. And, as to whether the court should consider the "speakers' reasonable expectations," Plaintiffs take this language from *ACLU* out of context. *ACLU,* 333 F.2d at 1100. Rather than applying a two-step analysis, which includes speaker expectations as Plaintiffs assert, *ACLU* identified three factors that the Ninth Circuit considers in determining whether an area constitutes a traditional public forum: the actual use and purposes of the property, particularly its status as a public thoroughfare and availability of free public access to the area; the area's physical characteristics, including its location and the existence of clear boundaries; and the traditional or historic use of both the property in question and other similar properties. *Id.* at 1101.

¶25 Even if Plaintiffs are correct that the Ninth Circuit has disapproved a "primary function and purpose" inquiry, it is nevertheless a part of the test applied by the United States Supreme Court and by this court in *Mighty Movers.* *See, e.g., Kokinda,* 497 U.S. at 728 ("The postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city."); *United State v. Grace,* 461 U.S. 171, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) (the location

and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum); *Greer*, 424 U.S. at 835-37 (mere physical characteristics of the property cannot dictate forum analysis; holding that even though a military base permitted free civilian access to certain unrestricted areas, the base was a nonpublic forum and the presence of sidewalks and streets within the base does not require a contrary finding); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981) ("the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved").

¶26 Whether or not a particular government easement warrants application of forum principles will depend on the characteristics of the easement, the practical considerations of applying forum principles, and the particular context the case presents. *Ark. Educ. Television Comm'n*, 523 U.S. at 672-77 ("Claims of access under our public forum precedents could obstruct the legitimate purposes of television broadcasters"; holding that public broadcast programming is not a public forum, *id.* at 674.); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1125, 1123 (10th Cir. 2002) ("To determine the easement's nature and purpose, the question we address is whether expressive activity is compatible with the purposes and uses to which the government has lawfully dedicated the property.").

¶27 Applying the forum analysis here, we note first that the easement is located on private property, owned by Rouse and operated as a shopping mall. The City's interest is limited to the easement. The extent of an easement, like any other conveyance of rights in real property, is fixed by the language of the instrument granting the right. *Olympic Pipe Line Co. v. Thoeny*, 124 Wn. App. 381, 393, 101 P.3d 430 (2004), *review denied*, 154 Wn.2d 1026 (2005); *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403, 409, 23 P.3d 243 (2001). An easement must be

construed strictly in accordance with its terms in an effort to give effect to the intentions of the parties. A party is privileged to use another's land only to the extent expressly allowed by the easement. *Mielke v. Yellowstone Pipeline Co.*, 73 Wn. App. 621, 622, 870 P.2d 1005 (1994). Trespass occurs upon the misuse or overburdening of an easement. *Brown v. Voss*, 38 Wn. App. 777, 782, 689 P.2d 1111 (1984). The easement here is for a limited purpose: to provide pedestrian access to the monorail station platform.

¶28 As to the "function of the particular forum involved," *Heffron*, 452 U.S. at 651, as noted above, the easement was granted only to provide "pedestrian access between the Improvements and Monorail Station." CP at 138 (Monorail Operating and Easement Agreement, Ex. C). And, as Rouse points out, the monorail itself is not a public forum. *Eze*, 111 Wn.2d at 31-32 ("[P]ublic transit is not a public forum."); *Int'l Soc'y for Krishna Consciousness*, 505 U.S. 672 (airport terminals are nonpublic forum). Further, the portion of the Westlake Center easement at issue consists of a series of escalators and hallways ascending three stories and an open area in the food court. These pathways are located inside a shopping mall and must accommodate the movement of millions of Westlake Center customers a year in addition to its use by monorail patrons. CP at 129 (Decl. of Brenda Klein). Finally, while the Agreement provides for certain speech activities within the three easements, the policy expressly "prohibits signs that are affixed to poles or sticks and any other sign that poses a safety threat." CP at 136 (Ex. B). In light of the primary function and purpose of the easement, as well as its physical characteristics, it cannot be said that a principal use of the interior easement is the free exchange of ideas.

¶29 Next, we consider whether the property shares the characteristics of a traditional public forum as well as the historical use of the property. Plaintiffs urge that the easement here, as with the easement in *ACLU*, possesses the characteristics of a traditional public forum. We disagree. In *ACLU*, a public/private partnership consisting of

the city and contributing Fremont Street businesses spent $70 million tearing up the street and sidewalks to create one large promenade, now referred to as the "Fremont Street Experience." Following the opening of the promenade, the American Civil Liberties Union (ACLU) of Nevada gathered to protest restrictions on free speech activities. These restrictions were an incorporation of the Las Vegas Municipal Code, which prohibited any form of solicitation in the Fremont Street Experience, including leafleting, unauthorized vending, and the unauthorized erection of structures. *ACLU*, 333 F.3d at 1095. The ACLU sought an injunction and a declaration that the restrictions were unconstitutional.

¶30 The Ninth Circuit concluded that the Freemont Experience is a public forum, focusing on the fact that the Freemont Experience continues to play its former role as a pedestrian thoroughfare. *Id.* at 1094. The court noted that the Fremont Street Experience unmistakably possessed the characteristics of a traditional public forum: "[t]he Fremont Street Experience was not only historically a public forum, but also falls into the type of property that is traditionally regarded as a public forum." *Id.* at 1104. In contrast to the Fremont Street Experience, the easement property here consists of a series of escalators and hallways constructed to serve customers of a shopping center. And, unlike the Fremont Street Experience, this property has never served as a public street or thoroughfare.

¶31 Plaintiffs contend, though, that the easement here, as in *First Unitarian Church*, is compatible with expressive activities because the property is " 'dedicated to general pedestrian passage.' " Appellants' Opening Br. at 13 (quoting *First Unitarian Church*, 308 F.3d at 1128). In *First Unitarian Church*, the Tenth Circuit began its analysis by considering the language of the easement at issue. The court noted that the express purpose for which the city retained the easement was to provide a pedestrian throughway for the general public. Additionally, the court observed that the city council passed an ordinance approv-

ing closure and sale of a street expressly contingent on the condition that the city retain a perpetual pedestrian easement "planned and improved so as to maintain, encourage, and invite public use." *First Unitarian Church*, 308 F.3d at 1126 (emphasis omitted). Because the purpose of the easement was not limited to ingress and egress to church facilities but intended for a broader public purpose than providing pedestrian passage, the court found the easement distinguishable from those walkways that have been held not to be public fora. *Id.* at 1127.

¶32 Unlike the easement at issue in *First Unitarian Church*, the only purpose of the easement here is to provide ingress and egress to the monorail platform, not to "maintain, encourage, and invite public use." *Id.* at 1126. Moreover, the easement in that case was located on property that had formerly constituted a public street. As in *ACLU*, the court in *First Unitarian Church* placed heavy emphasis on this aspect of the property in determining that the easement constituted a public forum. In this case, the property over which the easement was granted has always been in private hands—it was not a retained easement in property formerly owned by the government as a public street or sidewalk as was the case in *First Unitarian Church* and *ACLU*.

¶33 As Rouse and the City point out, the Westlake Center easement is more similar to the walkway in *Hawkins v. City & County of Denver*, 170 F.3d 1281 (10th Cir. 1999). In that case, a group of union musicians gathered to picket and distribute leaflets against the Colorado Ballet in the "Galleria" area of the Denver Performing Arts Complex (DPAC). The city and county of Denver, which own and operate the complex, halted plaintiffs' demonstrations in the Galleria. The Galleria, formerly a public street, is an open air, glass-covered pedestrian walkway approximately 600 feet long, bounded on one side by two large theaters, and on the other side by a parking garage and the Garner Galleria Theatre. A public right of way lies at one end of the Galleria. The Galleria serves as the exclusive means of

ingress to and egress from DPAC events taking place in the arts complexes. Several commercial establishments lease space within the confines of the facility.

¶34 The Tenth Circuit concluded that the Galleria is not a traditional public forum, "for it is not a park, nor is it analogous to a public right of way or thoroughfare. The Galleria does not form part of Denver's automotive, bicycle or pedestrian transportation grid, for it is closed to vehicles, and pedestrians do not generally use it as a throughway to another destination. Rather, the Galleria's function is simply to permit ingress to and egress from the DPAC's various complexes." *Id.* at 1287.

¶35 Plaintiffs attempt to distinguish *Hawkins*, saying that the easement here is so integrated into the City's transportation grid and used as an unrestricted public thoroughfare that it is indistinguishable from any city street or sidewalk. Specifically, they contend, the Westlake Center easement provides access to commercial establishments, the adjacent sidewalks, a public plaza and the bus tunnel, as well as the monorail, whereas the Galleria in *Hawkins* was a "pathway[ ] to nowhere."[1] Appellants' Reply Br. at 10. Plaintiffs overstate the distinctions between these cases. As noted earlier, the portion of the Westlake Center easement at issue consists of a series of escalators and hallways ascending three stories and an open area in the food court. Like the Galleria, Westlake Center is not open to traffic. While the easement leads to the monorail station platform, the easement itself is not a thoroughfare; it leads to the monorail station platform and the monorail itself travels to only one location, the Seattle Center. And, the City contracts with the Seattle Monorail Services, which is

---

[1] Plaintiffs urge this court to view the easement as not only providing access to the monorail but also as a "pathway to the scores of commercial establishments housed in Westlake shopping center." Appellants' Opening Br. at 38. However, the City's only interest in the easement is to provide access to the monorail—Westlake owns the property over which the easement to the City was granted. Persons wishing to access the commercial establishments within the Westlake Center do not do so through the right of access granted to the City through its easement but do so by using the private property that Westlake has developed for customer access.

a private company, to operate the monorail, a nonpublic forum.

¶36 Plaintiffs also point to *Venetian Casino Resort, LLC v. Local Joint Executive Board*, 257 F.3d 937 (9th Cir. 2001) for support. In that case, a Las Vegas casino, located on Las Vegas Boulevard South, sought a building permit to construct a new facility, requiring widening Las Vegas Boulevard by one traffic lane. The new lane of traffic would completely fill Nevada's right-of-way, leaving no remaining public right-of-way on which to locate a public sidewalk. The sidewalk, therefore, had to be relocated onto the Venetian's property. *Id.* at 940. The Venetian and the State signed an agreement providing that the Venetian construct and maintain on its property a private sidewalk connecting to public sidewalks on either side of its property for the purpose of providing unobstructed pedestrian access. *Id.* at 940.

¶37 The court held Venetian's sidewalk is a public forum. The court pointed to the historically public character of the sidewalk, its continued use by the general public, and the fact that the sidewalk is connected to and virtually indistinguishable from the public sidewalks to its north and south and was the only means for pedestrians to travel along the Venetian's side of Las Vegas Boulevard. The court also noted that the agreement dedicating the property demonstrated that the property was intended for general public use. In sum, the court stated, "It is the historical use of the sidewalk adjacent to Las Vegas Boulevard that is significant, not the piece of land on which the replacement sidewalk had to be located." *Id.* at 944.

¶38 Unlike the sidewalk in *Venetian* or the Freemont Experience in *ACLU*, the easement here has not historically served as a public thoroughfare. The easement is a recent construction. It did not replace a public sidewalk. It does not abut a public street; rather, it is fully contained within a private shopping mall. Unlike a traditional sidewalk, street, or park, areas that have "immemorially been held in trust for the use of the public," people do not gather

on the escalators or the hallway of the food court "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague,* 307 U.S. at 515.

¶39 In sum, we conclude that the easement here is not a traditional public forum, nor has the government opened its easement for use by the public as a place for expressive activity. Accordingly, we hold that the interior easement is a nonpublic forum.

¶40 Next, we consider whether the restriction imposed is " ' "reasonable in light of the purpose served by the forum" ' " and whether the restriction is " ' "viewpoint neutral." ' " *Huff,* 111 Wn.2d at 926, 928 (quoting *Eze,* 111 Wn.2d at 32 (quoting *Cornelius,* 473 U.S. at 806)). The restriction on speech complained of here was promulgated by Westlake Center security in response to the February 15, 2003 protest. Thus, the test to be applied to the oral policy of requiring stick-mounted signs to be held down is whether the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Council of Greenburg,* 453 U.S. at 130; *Mighty Movers,* 152 Wn.2d at 351. Restrictions in a nonpublic forum are evaluated "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 809. Although Plaintiffs do not concede that the easement is a nonpublic forum, they argue that even if the less protective standard for nonpublic forum speech applies, the regulation nevertheless violates protected speech. This is so, Plaintiffs claim, because there is no proof that anyone has been hurt by a stick and, therefore, the restriction is not reasonable. The trial court found that the restriction was a reasonable response to safety concerns in the physically limited environment that includes three escalators.

¶41 In *Mighty Movers,* the City enacted an ordinance banning the posting of signs on its utility poles to protect the safety of utility workers who must climb the poles, to enhance public safety by promoting unobstructed vision for

drivers and pedestrians, to prevent damage to public property, and to enhance urban aesthetics. *Mighty Movers*, 152 Wn.2d at 362-63. As in that case, Rouse instituted the oral regulation in the interest of safety. A sign on a stick, held aloft, presents a safety concern, particularly in the narrow confines of an escalator. Moreover, as noted in the declaration by Frank Kampsen of Westlake Center security, "I personally witnessed several occasions on which patrons of Westlake Center were nearly injured by mounted signs. Those 'near misses' involved mounted signs that people left lying on the floor as well as mounted signs that people wielded carelessly as they walked through the mall, rode the escalators, and stood in line for the Monorail." CP at 118 (Decl. of Frank Kampsen).

¶42 Plaintiffs rely primarily on three cases for their contention that the Defendant's evidence of safety concerns is insufficient. First, Plaintiffs cite *Jacobsen v. City of Rapid City*, 128 F.3d 660 (8th Cir. 1997). In that case, the city banned commercial news racks in the airport. The court, recognizing that the airport is a nonpublic forum, nevertheless held that the ban constituted a violation of free speech rights because the regulation was unreasonable and the city's justifications unsupported. The court observed that the city's argument that news racks interfered with airport maintenance was supported only by vague hearsay testimony of complaints by airport cleaning crews. Further, it noted that the city's concern that news racks were unstable or top heavy was not supported by evidence of injury from Jacobsen's news racks. The court found that the city's claim regarding airport security was mere pretext and, though it found the city's contention that news racks detract from airport decor valid, that interest did not justify a total ban. Looking at the issue more broadly, the court held that although some of the City's concerns were reasonable, those concerns did not justify a total ban and that the airport's concerns could be addressed with reasonable time, place, and manner restrictions. *Id.* at 663.

¶43 In the second case cited by Plaintiffs, *Jews for Jesus, Inc. v. Massachusetts Bay Transportation Authority*, 984

F.2d 1319 (1st Cir. 1993), the transit authority imposed a total ban on leafleting. The authority contended that its concern for passenger safety justified the ban. In particular, it claimed that leafleting caused obstacles, threatened public safety by disrupting passenger flow, and created litter. The court acknowledged that public safety is a substantial government concern that can justify incidental infringement of protected speech. *Id.* at 1324. However, there was no evidence that the concerns cited by the authority justified a total ban on expression. *Id.* Similarly, in the third case cited by Plaintiffs, *Springfield v. San Diego Unified Port District,* 950 F. Supp. 1482 (S.D. Cal. 1996), the restriction at issue was a total ban on conducting or participating in any speechmaking and/or proselytizing, carrying, displaying or causing to be displayed any signs or placards, and distributing any literature, pamphlets, or other printed material. *Id.* at 1491. The court held that the ban against leafleting was unconstitutional under *International Society for Krishna Consciousness,* 505 U.S. 672. Further, it observed that the prohibition against proselytizing was not content neutral and that the ban on signs was not limited by the size, shape, or description of the sign.

¶44 We find these cases inapposite. In each case, the courts held that the evidence was insufficient to justify a total ban on expression. Unlike the ban at issue in those cases, the regulation here did not completely ban the signs; it merely required persons carrying signs mounted on sticks to hold the sticks down. These cases do not suggest that the evidence presented here to justify the oral regulation is in any way insufficient.

¶45 Additionally, there were alternate channels of communication. *See Perry Educ. Ass'n,* 460 U.S. at 53-54. As noted, the interior easement is only one of three public access points for the Monorail Station platform. The regulation at issue was not applied to those alternate access points. Thus, a person wishing to access the monorail had other convenient alternatives to which the sign limitation did not apply. Accordingly, we hold that the oral policy

requiring persons using the interior public easement in Westlake Center to hold stick-mounted signs down is a reasonable regulation on speech and not an effort to suppress expression.

¶46 Next, Plaintiffs claim that the speech restrictions contained in section 9(a)(i)(A) of the Agreement are overbroad. As noted earlier, the Agreement prohibits conduct that may "create a disturbance, attract attention or harass, disparage or be detrimental to the interests of any of the retail or business establishments within the Improvements; and (B) with respect to the Monorail Station Platform, parade, rally, patrol, picket, demonstrate or engage in any conduct that would tend to obstruct, hinder or impede the egress or ingress to the Monorail System or Accessway." CP at 144 (Ex. C).

¶47 Here, the conduct complained of stemmed from the February 15 conduct of the Westlake security team. The policy that was enforced against the Plaintiffs was promulgated specifically for dealing with the demonstration planned for that date. The policy being enforced is not contained in the easement agreement. Under the circumstances, we hold that an overbreadth challenge to the easement is unavailable to the Plaintiff.

¶48 In *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984), the Court noted that the facial overbreadth doctrine represents an exception to the general rule that "a litigant only has standing to vindicate his own constitutional rights." *Vincent*, 466 U.S. at 796. As the doctrine developed, however, the Court recognized that the overbreadth doctrine itself "might sweep so broadly that the exception to ordinary standing requirements would swallow the general rule." *Id.* at 799. Ordinarily, the overbreadth rules apply to avoid the chilling effect from the threat of enforcement. "Because of the 'sensitive nature of protected expression,' and the need to prevent criminal sanctions from chilling constitutionally protected expression, both this court and the United States Supreme Court have fashioned a special

standing rule." *O'Day v. King County*, 109 Wn.2d 796, 803, 749 P.2d 142 (1988) (quoting *New York v. Ferber*, 458 U.S. 747, 768-69, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)).

¶49 As the language of *O'Day* suggests, the overbreadth rules have been applied in situations where there is a punitive government law or regulation. Plaintiffs have cited no case in which a contract for an easement (an interest in property), which is not a positive law and which carries no punitive sanctions, is subject to these rules. Although Plaintiffs point to Westlake Center's "banning" policy, which mall security may employ to address unwanted behavior in the center, it is not a part of the easement agreement and constitutes only a policy of the Westlake Center.

¶50 In addition, in order to invoke the special standing that the overbreadth rules convey, the Plaintiffs should, at a minimum, have been affected by the rule or regulation they challenge. As noted, the rule being applied by the Westlake Center security personnel on February 15 regarding stick-mounted signs was not contained within the easement. Accordingly, we hold that Plaintiffs lack standing to challenge the speech policies contained within the easement on the basis of overbreadth.

¶51 Finally, Plaintiffs contend that the restriction on carrying stick-mounted signs was an unconstitutional prior restraint on protected expression.[2] "Prior restraints are ' "official restrictions imposed upon speech or other forms of expression in advance of actual publication." ' " *JJR, Inc. v. City of Seattle*, 126 Wn.2d 1, 6, 891 P.2d 720 (1995) (quoting *City of Seattle v. Bittner*, 81 Wn.2d 747, 756, 505 P.2d 126 (1973) (quoting Thomas I. Emerson, *The Doctrine of Prior Restraint*, 20 L. & CONTEMP. PROBS. 648 (1955))). While under the First Amendment "a system of prior restraint is not presumptively unconstitutional," *JJR*,

---

[2] Plaintiffs also contend that other restrictions in the easement agreement constitute a prior restraint. For the same reasons that we decline to conduct an overbreadth analysis, we also decline to extend our prior restraint review to the restrictions in the agreement.

126 Wn.2d at 6 n.4, a prior restraint is unconstitutional per se under article I, section 5; *JJR*, 126 Wn.2d at 6; *O'Day*, 109 Wn.2d at 804.

¶52 Plaintiffs contend that the restriction here constituted a prior restraint on speech. However, not every regulation of speech is a prior restraint. Regulations that do not ban expression but instead impose valid temporal, geographic, or manner of speech limitations are analyzed as time, place, and manner restrictions. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 126, 937 P.2d 154 (1997); *State v. Coe*, 101 Wn.2d 364, 373, 679 P.2d 353 (1984). Where a nonpublic forum is involved, speech may be restricted by reasonable time, place, and manner restrictions and by distinctions that are reasonable in light of the purpose served by the forum and are content neutral. *Huff*, 111 Wn.2d at 926, 928; *see Perry*, 460 U.S. at 46.

¶53 The oral policy requiring persons using the interior easement to hold stick-mounted signs down was not a ban on speech but instead imposed valid time, place, and manner restrictions. The policy was content neutral. The manner of speech was regulated for the protection of other persons using the center and to keep the easement passage open and accessible. This limitation was especially important because escalators, which must be traveled carefully, form a significant part of the easement. The geographic location was also validly limited because while signs had to be lowered in the center itself, they could be carried aloft on nearby public sidewalks outside of and adjacent to the center. We hold that the restriction in effect on February 15 regulating the manner in which stick-mounted signs could be carried constituted a valid time, place, and manner restriction in a nonpublic forum, not a prior restraint.

¶54 We affirm the trial court.

C. JOHNSON, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶55 ALEXANDER, C.J. (concurring) — I agree with the majority opinion by Justice Madsen. I write separately in order to set forth my view that even if we were to conclude that the area of the Westlake Center that we have focused on in this case is a traditional public forum, as Justice Sanders asserts, the center's regulation would pass constitutional muster. I say that because this restriction can be said to be necessary only to serve a compelling state interest, and it is narrowly drawn to achieve that end. In short, merely requiring Beth Sanders and William and Patricia Daugaard to briefly lower their signs as they passed through an area where large numbers of people congregate in order to board onto or disembark from the Seattle Center Monorail is entirely reasonable and a minor limitation on their ability to communicate the message on their signs.

¶56 SANDERS, J. (dissenting) — The majority holds Westlake Center may constitutionally prohibit picketing at Westlake's Seattle Center Monorail (Seattle Monorail) station at Fifth and Pine in downtown Seattle, notwithstanding clear precedent that public transit stations are public forums. Because it is a public forum, Westlake Center's restriction on signs must be narrowly tailored to serve a compelling interest. However, this regulation absolutely prohibits any form of picketing anywhere, anytime, under any circumstance. Furthermore, the prohibition leaves no alternative channel for would-be picketers to express their message. This blanket prohibition violates the First Amendment.

¶57 Beth Sanders and William and Patricia Daugaard planned to attend an antiwar protest at Seattle Center. They went to Westlake Center to use the Seattle Monorail. The Daugaards, after seeing the long lines for the monorail, decided to leave the station. As he exited, Mr. Daugaard refused to succumb to repeated commands to lower his protest sign. Beth Sanders decided to ride the monorail and as she waited she held her sign high, peacefully proclaiming her discontent with the war in Iraq. No passengers reported being disturbed or delayed; there were no reports of vio-

lence or injuries. Nevertheless, Sanders was eventually forced to lower her sign.

¶58 Picketing is a basic and essential means of protest, clearly protected by our right to free speech. *Frisby v. Schultz*, 487 U.S. 474, 479, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988) ("Because of the importance of 'uninhibited, robust, and wide-open' debate on public issues, we have traditionally subjected restrictions on public issue picketing to careful scrutiny." (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964))); *Carey v. Brown*, 447 U.S. 455, 466-67, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980) ("[P]icketing . . . 'has always rested on the highest rung of the hierarchy of First Amendment values . . . .' " (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963))); *Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 862 (9th Cir. 2001) ("Because the ordinance clearly regulates picketing . . . , the ordinance necessarily regulates expressive activity protected by the First Amendment."). Rather than rigorously scrutinizing Westlake's regulations, as the Supreme Court commands we do, the majority inhibits "robust[ ] and wide-open debate" on the important public issue of the Iraq war by upholding Westlake's absolute ban on picketing anywhere, anytime on the public easement. *See Boos v. Barry*, 485 U.S. 312, 318, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988) (citing *New York Times Co.*, 376 U.S. at 270).

*I. The Seattle Monorail station is a designated public forum*

¶59 Here the critical determination is whether the monorail station is a public or nonpublic forum. The Seattle Monorail station is akin to a bus or train station; it is an access point for commuters to board onto and disembark from local public transit. Bus terminals are public forums. *Wolin v. Port of N.Y. Auth.*, 392 F.2d 83 (2d Cir. 1968).

This easement is merely an extension of the transit station, allowing people access to and from the station.[3]

¶60 *Wolin* concerned Vietnam protestors at a New York Port Authority bus terminal. Some protestors carried placards. The Second Circuit Court of Appeals inquired whether the "character of the place, the pattern of usual activity, the nature of its essential purpose," *Wolin*, 392 F.2d at 89, made the terminal a public forum and held:

> The Terminal building is an appropriate place for expressing one's views precisely because the primary activity for which it is designed is attended with noisy crowds and vehicles, some unrest and less than perfect order. Like a covered marketplace area, the congestion justifies rules regulating other forms of activity, but it seems undeniable that the place should be available for use in appropriate ways as a public forum. . . . To deny access to political communication seems an anomalous inversion of our fundamental values.

*Id.* at 90 (footnote omitted). *Wolin* has often been cited with approval. *Jamison v. City of St. Louis*, 828 F.2d 1280 (8th Cir. 1987); *Jews for Jesus, Inc. v. Bd. of Airport Comm'rs*, 785 F.2d 791 (9th Cir. 1986); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1042 (5th Cir. 1982); *Fernandes v. Limmer*, 663 F.2d 619, 626 (5th Cir. 1981); *Bus. Executives' Move for Vietnam Peace v. Fed. Commc'ns Comm'n*, 146 U.S. App. D.C. 181, 450 F.2d 642, 659 (1971) ("We do not have to decide whether the broadcast medium inherently

---

[3] The bus terminal described in *Wolin* is nearly identical to the forum at issue before us today:

> The Bus Terminal building operated by the Port Authority occupies a full city block in Manhattan. Thousands of persons use the terminal facilities, entering from the subway or through six outside entrances, using the fifty foot wide main concourse and four other levels to get to and from buses, subways, city streets, shops and other concessions. In 1966 the average number of persons passing through the building each day approximated 205,000 and on December 24, 1966 some 325,000 people used the facility. The Terminal contains, in addition to the open concourse areas and waiting rooms, bus line ticket counters, newsstands, restaurants, snack bars, a bakery, a drugstore, a bar, a bowling alley, a bank, gift shops and various other shops and concessions which are open to the general public.

*Wolin*, 392 F.2d at 85.

amounts to a 'public forum' on the order of public streets or parks or meeting halls or even bus terminals."), *rev'd on other grounds by Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S. Ct. 2080, 36 L. Ed. 2d 772 (1973); *Moskowitz v. Cullman*, 432 F. Supp. 1263, 1266 (D.N.J. 1977) ("The terminal is a building, constructed, owned, operated and maintained by a public authority. It is open to the public, and it is in fact used by thousands of citizens each day as they travel to and from work."); *Toward Gayer Bicentennial Comm. v. R.I. Bicentennial Found.*, 417 F. Supp. 632, 639 n.9 (D.R.I. 1976) ("It could be argued that, while the Old State House is a public forum, it is not as wide open a one as a street, a park, or a bus station. Certainly public access to such a building does not have roots in 'time immemorial,' and the building cannot be considered a mere enclosed public thoroughfare through which large numbers of people pass each day, the way a bus station or even the rotunda of a state capitol building can." (citation omitted)).[4]

¶61 As part of its designated public forum test, the majority asks "whether a *principal* purpose' of the property is the free exchange of ideas." Majority at 211 (emphasis added). None of the cases the majority cites for its test ever uses the phrase "principal purpose."[5] Rather, *Kokinda* reasoned:

---

[4] To support its holding that the monorail is not a public forum, the majority relies on inapposite authority. In *Krishna*, a plurality of the United States Supreme Court held that airport terminals are nonpublic forums. *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 679, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992). But the Court made clear its holding was guided by the security concerns particular to airports. Such concerns do not bear on our analysis here. Also, the majority cited *City of Seattle v. Eze*, 111 Wn.2d 22, 31-32, 759 P.2d 366 (1988), which held public transit itself is not a public forum. *See* majority at 215. Similarly, the United States Supreme Court held the interior of a city-operated transit vehicle is a nonpublic forum. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974). But we are concerned with what happened outside the monorail. And the monorail station, like a public bus terminal, is a designated public forum.

[5] Later the majority cites *International Society for Krishna Consciousness*, a plurality Supreme Court case that held an airport was not a traditional public forum. Majority at 212 (citing *Int'l Soc'y for Krishna Consciousness*, 505 U.S. 672).

"[T]he Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum."

*United States v. Kokinda*, 497 U.S. 720, 726, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (plurality opinion) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). Therefore, while the location and purpose of government owned property informs the analysis, it is not necessary to find the principal purpose of the monorail station is the free exchange of ideas in order to find it is a public forum. Instead *Kokinda* balances the competing interests. Here the public's interest in free speech substantially outweighs the government's preference to prohibit it.

¶62 By holding the easement is a nonpublic forum, the majority potentially stifles all free speech, even innocuous activities such as distributing leaflets or merely posting signs in the public spaces. This is because we must apply the far more deferential reasonableness standard to non-public forums, allowing the government to exclude entire classes of speech or regulate speech by its content: "Control over access to a nonpublic forum can be based on *subject matter* and *speaker identity* so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806 (emphasis added). Apparently the majority believes this is more appropriate, suggesting a monorail station is more akin to a military base than to a bus terminal. *See Greer v. Spock*, 424 U.S. 828, 838, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) (holding a military base is a nonpublic forum

---

This case does use "principal purpose" language but only as dicta in discussing a *traditional* public forum. *Krishna*, 505 U.S. at 679; *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985) ("Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.").

because it is "the business of a military installation . . . to train soldiers, not to provide a public forum").

¶63 The majority relies on the easement itself to determine the nature of the rights involved, as if a private corporation may say what rights we do and don't have when it allows the government to use its land. Majority at 214-15. The majority concludes the easement is only for the limited purpose of providing pedestrian access to the Monorail Station since "[a]n easement must be construed strictly in accordance with its terms in an effort to give effect to the intentions of the parties." *Id.* But as the Tenth Circuit Court of Appeals found, "a deed does not insulate government action from constitutional review. If government actions taken with respect to the easement violate the Constitution, this simply means the easement terms themselves are unconstitutional and must be altered or eliminated by the involved property owners." *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1122 (10th Cir. 2002) (citation omitted). Nor does "the mere fact the government has an easement rather than fee title . . . defeat application of the First Amendment." *Id.* at 1123 n.5; *see also Cornelius*, 473 U.S. at 801 (finding that public forums may include private property dedicated to public use). People have free speech rights at the Monorail Station regardless of what the easement does or does not say.

¶64 Furthermore, it is immaterial if the easement's principal purpose is to facilitate pedestrian traffic. *See Marsh v. Alabama*, 326 U.S. 501, 506, 66 S. Ct. 276, 90 L. Ed. 265 (1946) ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."). The *Wolin* court also found, "the character and function of the Terminal[ ] makes clear that it is a thoroughfare used by thousands of people each day. . . . They are in the Terminal for the principal purpose of moving to and from other means of transportation—and the space is designed for precisely the purpose of transit." *Wolin*, 392 F.2d at 89. But this is

precisely what makes the bus terminal a public forum. *Id.* (finding the port authority's argument that the purpose of the terminal did not include protesting "evidence[d] too little regard for the vagaries of effective communication, and for the versatility of the First Amendment's proscription"). Similarly, the Ninth Circuit Court of Appeals holds a privately owned sidewalk is also a public forum when "the sidewalk is used 'to facilitate pedestrian traffic in daily commercial life . . . ,' and not merely to provide access to the Venetian for its patrons." *Venetian Casino Resort, LLC v. Local Joint Exec. Bd.*, 257 F.3d 937, 944 (2001) (quoting *Venetian Casino Resort, LLC v. Local Joint Exec. Bd.*, 45 F. Supp. 2d 1027, 1035 (D. Nev. 1999)). Any ordinary sidewalk *principally* provides pedestrian access to particular destinations. Will the majority now further deny public forum status to all sidewalks?[6]

## II. *Westlake's free speech restrictions are not narrowly tailored to a significant interest*

¶65 The majority correctly finds Westlake's restrictions are content-neutral, though it incorrectly finds Westlake's restrictions are constitutional. A content-neutral restriction regulates the time, manner, or place of speech and is " 'justified without reference to the content of the regulated speech.' " *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)). Westlake mandates all signs " 'must be carried low to the ground and close to the body of the person holding the sign,' " at any location and at

---

[6] By citing cases that examine a forum's historical role, the majority seemingly argues a modern place, such as an interstate rest stop, is not attended with as many rights as an older one. Majority at 211-12. But these cases examine whether a type of forum has been a *traditional* public forum. *See Jacobsen v. Bonine*, 123 F.3d 1272 (9th Cir. 1997); *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 494 (7th Cir. 2000). While a monorail station might not be a *traditional* public forum (even though it is akin to a bus terminal or a sidewalk—both traditional public fora), it is still a designated public forum and the same rights attach to either a traditional or a designated public forum. A forum's age, in and of itself, is immaterial: one does not lose rights simply by stepping from an old piece of sidewalk to a new one.

all times. Majority at 206 (quoting Westlake policy). In other words, irrespective of message, protestors must carefully carry their signs to and from the monorail but may not picket at the Monorail Station itself or even raise the signs above their heads as they travel.

¶66 The test for any content-neutral restriction is whether the restriction in question is narrowly tailored to a significant government interest. *Ward*, 491 U.S. at 798-99. Westlake's restrictions cannot meet this test. While public safety is a "significant interest," prohibiting all picketing is not necessarily tailored narrowly to serve that interest.[7] The majority ignores cases invalidating similar restrictions because it finds Westlake's restriction "did not completely ban the signs . . . ." Majority at 222. Allowing signs is irrelevant, however, because Westlake in effect completely bans picketing by forcing all signs to be held down and close to the body where their message is invisible. One cannot picket if no one can read the message on the picket sign.

¶67 The majority fears that a "sign on a stick, held aloft, presents a safety concern, particularly in the narrow confines of an escalator." Majority at 221. Nevertheless, it upholds a ban affecting the entirety of the Monorail Station, even the open-spaced boarding platform that connects the station to the shopping center and the wide entrance corridor. A sign on a stick will always present some hazard, but not one great enough to justify forsaking our constitutional rights. In *United States v. Grace*, the Supreme Court held maintaining order, while a significant interest, did not justify a "prohibition of carrying signs, banners, or devices on the public sidewalks surrounding the [Supreme Court building]." 461 U.S. 171, 183, 103 S. Ct. 1702, 75 L. Ed. 2d

---

[7] Additionally, the regulations leave no alternative means of communication. The protestors have nowhere else to go; picketing inside the Westlake Center is strictly prohibited. The majority claims people wanting to picket can simply use another means of entering the Monorail Station, without explaining why Westlake's policy or the court's broad holding is inapplicable to these areas, which are encompassed within the same easement. Majority at 222-23. Alternatively, the majority suggests petitioners can simply use the public sidewalks outside. However, telling someone to just go somewhere else to protest is not an alternative means of communication.

736 (1983) ("We do not denigrate the necessity to protect persons and property or to maintain proper order and decorum within the Supreme Court grounds, but we do question whether a total ban on carrying a flag, banner, or device on the public sidewalks substantially serves these purposes." *Id.* at 182.). Westlake is right to be concerned about public safety. But this interest cannot summarily trump the right to protest and picket, and we cannot let fear of some hypothetical injury justify an abridgement of one's First Amendment rights.

¶68 Certainly, a protestor must be sure not to endanger those around him, and Westlake may take reasonable steps to make sure protestors act properly, but banning all picketing is not a reasonable step. In *Foti v. City of Menlo Park*, the Ninth Circuit held it was permissible for a city to require picketers to have small signs, since "[e]xtremely large or numerous picket signs nearby could well interfere with a bus's operation or with pedestrian circulation on the sidewalk." 146 F.3d 629, 641 (9th Cir. 1998) ("Regulations of the size and number of picket signs are permissible as long as they are 'not so restrictive as to foreclose an effective exercise of First Amendment rights.'" *Id.* at 642 (quoting *Verrilli v. City of Concord*, 548 F.2d 262, 265 (9th Cir. 1977))). That rule, the court held, did not pose a significant burden on the appellants' ability to communicate their message because "a substantial portion of [the] intended audience, could see and read their three square foot signs." *Id.* There is no chance a substantial portion of Sanders' or the Daugaards' intended audience will be able to see and read signs "carried low to the ground and close to the body." While Westlake's other regulations requiring signs be held safely and not block other passengers may be arguably reasonable, this one is not.[8]

---

[8] Additionally, the *Foti* court noted, "A picketer who uses a sign to block traffic or obscure drivers' views may also be cited under existing ordinances or other traffic laws. A picketer who harasses or assaults passersby may be cited for disturbing the peace or charged with assault. Obvious, less burdensome means for achieving the city's aims are readily and currently available by employing

¶69 Neither Sanders nor Daugaard caused any disruption, delay, or other problem. Sanders simply waited patiently in line, while the Daugaards calmly exited the station, all while holding protest signs. Such is their right.

¶70 I dissent.

¶71 CHAMBERS, J. (dissenting) — Somewhere in the world, a woman stands in silent vigil for those who have died. Somewhere in the world, a man stands on a box preaching the gospel while holding a sign that proclaims, "Jesus Saves." Somewhere in the world, a man wearing a robe passes out leaflets warning that the government is oppressive. Somewhere nearby, a high court in America upholds a policy prohibiting antiwar protestors from picketing on a public thoroughfare to public trains. I have no doubt which of these acts should cause the greatest alarm.

¶72 I agree with Justice Sanders that the Westlake Center walkway to the Seattle Center Monorail Station is a public forum. Dissent at 227-28. The Westlake Center walkway unmistakably possesses the characteristics of a traditional public forum where people in free countries are free to gather and exchange ideas. Dissent at 228-29. The Westlake Center walkway is like any other train, bus, or subway station around the world. It is exactly because people crowd into railway and subway stations that shops and businesses abound and people go there to express their ideas.

¶73 I agree with the majority that public safety is a legitimate concern. Majority at 221. The candle may light a fire, the stick may poke, and leaflets may clutter, but they are all risks we assume in a free society. We endure and embrace these potential harms willingly as the price we pay to freely exchange ideas without government interference. Depending on how vigorously they wield their messages, protestors and preachers may properly provoke caution

---

traditional legal methods." 146 F.3d at 642. Similarly, Westlake and the city of Seattle have myriad options available to maintain public safety and order.

from those passing by, but they should rarely cause alarm. It is instead courts' tolerance for slowly stripping away, one painful precedent after another, the First Amendment right of freedom of expression that *should* cause alarm.

¶74 Our constitution was born out of a revolution from an oppressive regime. Our founders sought to guarantee freedom from future oppressive regimes. The real risk is not the clutter, or the poke, or even the fire; it is the slow, gradual erosion of freedom, one governmental decision at a time. Today, the majority suggest the government can contract away our freedoms by easement agreements. I must dissent.